**UNITED STATES of America, Appellee,**

v.

**Patrick Henry DIAMOND, Appellant.**

**No. 85–5259.**

United States Court of Appeals,
Fourth Circuit.

Argued March 6, 1986.

Decided April 22, 1986.

Roger W. Frydrychowski (J. Waller Harrison, McGuire, Woods & Battle, Richmond, Va., on brief), for appellant.

Gregory Welsh, Asst. U.S. Atty. (Justin W. Williams, U.S. Atty., John C. McDougal, Sp. Asst. U.S. Atty., Richmond, Va., on brief) for appellee.

Before PHILLIPS and SPROUSE, Circuit Judges, and MICHAEL, United States District Judge for the Western District of Virginia, sitting by designation.

JAMES DICKSON PHILLIPS, Circuit Judge:

This is an appeal by Patrick Henry Diamond from his convictions, following a bench trial, on two counts of willfully making and subscribing false federal income tax returns for 1980 and 1981, in violation of 26 U.S.C. § 7206(1).[1] Diamond makes several assignments of error,[2] but his major contentions on appeal are that, as a matter of law, he lacked the requisite intent to violate the statute, and that, in the alternative, the evidence was insufficient to support his convictions. Finding no error, we affirm the district court.

## I

At the time these tax returns were filed, Diamond was the Vice President of Finance at Robertshaw Controls Company in Richmond, Virginia, with responsibility for its financial, treasury, and tax departments, among others. Diamond is a Certified Public Accountant, and holds a combined Master's of Business Administration and Law degree from Columbia University, as well as an advanced degree in tax law from New York University.

The government's indictment in this case arose, in large part, from Diamond's characterization, on his 1980 and 1981 tax returns, of his losses in connection with numerous stock option and commodity futures transactions completed in 1980. Diamond was not a licensed broker or dealer, traded exclusively for his own account, and never took delivery on any of the underlying commodities in which he traded.

Prior to 1980, Diamond properly reported his losses from this activity as capital losses, on Schedule D forms. In 1980, however, he reported such trading losses as ordinary business losses on Schedule C "Profit or (Loss) From Business or Profession" forms. This change in treatment significantly affected Diamond's tax liability in the relevant years because, although "capital" losses from the sale or exchange of capital assets are deductible by an individual taxpayer only to the extent of $3,000 in any tax year, 26 U.S.C. §§ 165(f), 1211(b), "ordinary" trade or business losses are generally deductible in their entirety, 26 U.S.C. § 165(a), (c). By treating his 1980 trading losses as ordinary, Diamond was thus able to deduct their full amount, or $139,130, which resulted in a zero tax liability and a $10,052 refund claim in 1980.

---

**1.** Section 7206(1) provides that
> Any person who—
> (1) *Declaration under penalties of perjury*—Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter ....
> shall be guilty of a felony....

**2.** In addition to the issues discussed in this opinion, Diamond raises questions relating to the admissibility of evidence of his prior and subsequent returns, the trial court's exercise of discretion in sentencing, and the compliance of probation conditions imposed by the court with the Federal Probation Act, 18 U.S.C. § 3651. We have reviewed these allegations and find no error.

According to the government, Diamond's 1980 tax liability for that year in fact exceeded $20,000, when the trading losses are properly recast as capital losses.

Diamond contends that he claimed ordinary business losses in 1980 because he had, by that time, begun to operate in a "trading business" by virtue of the increased number and dollar amount of the commodity futures and stock options transactions in which he was involved. According to the evidence adduced at trial, although the number of contracts traded was higher in 1980 than in 1979 (289 versus 78), the total number of trades was approximately the same. Diamond's stock option purchases rose only slightly ($305,301 to $345,531), and total option sales *decreased* in 1980 (from $252,819 in 1979 to $185,064 in 1980). Diamond claims that, although he continued to function as Vice President for Robertshaw, he spent between 25 and 30 hours each week trading for his own account during 1980. He also leased a stock ticker until the fall of 1980 when Robertshaw began to trade in commodities and took over the lease payments.

On his 1980 Schedule C form, Diamond described his "main business activity," to which he attributed the losses, as "wholesale dealer" in "agric. produce." Diamond maintains that this description accurately characterized his stock options and commodity futures "trading business" because 47% of his 1980 commodity futures transactions involved contracts for agricultural products. The remaining 53% of the commodities trades involved financial instruments, metals, and foreign currency. The business description made no reference to Diamond's stock option transactions, which comprised the bulk of his trading activity and which he implicitly concedes lacked even a tenuous connection with "agricultural produce."

In the space provided on the Schedule C for indicating the name of his business, Diamond stated that he operated "individually and as Patrick Henry Farms." Patrick Henry Farms was the name of Diamond's horse racing enterprise. According to Diamond, he intended to indicate that he operated two distinct businesses—community futures and stock option trading (individually) and horse racing (as Patrick Henry Farms)—and not to mislead the Internal Revenue Service, as the government contends, to believe that Patrick Henry Farms had suffered the reported losses on "agricultural produce." Diamond's horse racing losses were not reflected on the Schedule C, however, because of his alleged belief that such deductions would be disallowed. Diamond contends that he intended to file an amended 1980 return at some future date to claim such racing losses and that his inclusion of Patrick Henry Farms on the Schedule C was merely intended to "signal the start of his horse racing business."

Diamond's 1980 Schedule C also reflected a deduction of $4,114 for "taxes," which actually represented payments of personal state income taxes in connection with his salary from Robertshaw. Although he would have been entitled to this deduction in any event, 26 U.S.C. § 164(a)(3), it bore no relation to the alleged wholesale "agricultural produce" business described on the Schedule C. The government theorizes that Diamond deducted the taxes on the Schedule C in order to further its "ordinary" appearance.

In 1981, Diamond reverted to reporting his trading losses as capital losses, but carried over a net operating loss deduction from 1980 of $57,550, the unused portion of his business loss claimed in 1980. As a result, Diamond claimed a refund of $17,043 in 1981; the government asserts a tax liability in excess of $27,000 for that year. In addition, Diamond deducted a "job reference cost" of $2,000 in 1981, which actually represented contributions to the reelection campaign of Miami Mayor Maurice Ferre. As a political campaign contribution, the deduction would have been limited to $25. According to Diamond, the payment was intended to secure a job reference from Ferre, his former employer, in the event of a takeover of Robertshaw. Diamond claims that he believed that a takeover was

imminent after another company acquired 5% of Robertshaw stock in September 1981; he sent the first of two checks to Ferre's campaign shortly thereafter. The evidence at trial also showed that, although Diamond filed a Schedule C in connection with his own 1980 investment losses, he caused his father, for whom he also engaged in similar trading, to report only capital losses for that year.

The trial court found Diamond guilty on both counts, and this appeal followed.

## II

■ Diamond first contends, relying on this court's decision in *United States v. Critzer*, 498 F.2d 1160 (4th Cir.1974), that as a matter of law he could not be guilty of willfully filing false federal income tax returns as charged. In *Critzer*, we observed that "when the law is vague or highly debatable, a defendant—actually or imputedly—lacks the requisite intent to violate it." *Id.* at 1162. Thus, where the government advances a "pioneering interpretation" of tax liability, "[t]he obligation to pay is so problematical that the defendant's actual intent is irrelevant." *Id. See also United States v. Mallas*, 762 F.2d 361 (4th Cir.1985). Diamond argues that under this principle his convictions must be reversed, notwithstanding the trial court's finding that he intended to violate the statute, because the legal distinction between capital and ordinary losses, as applied in this case, is impermissibly vague. We disagree.

Section 1221 of the Internal Revenue Code broadly defines capital assets to include "property held by the taxpayer," and then narrows that definition by enumerating various exclusions. In this case, the only relevant exclusion concerns "property held by the taxpayer primarily for sale to

customers in the ordinary course of his trade or business." 26 U.S.C. § 1221(1). Because such property is outside of the definition of a capital asset, gains or losses produced by its sale or exchange must be accorded ordinary income tax treatment.

Diamond contends that it is at least debatable whether, under this provision, his securities were held, in 1980, "primarily for sale to customers" in the ordinary course of his trade or business, and thus whether they were capital assets subject to the limitation on deductibility of losses contained in 26 U.S.C. § 1211. As will appear, however, this issue has been thoroughly litigated, and courts have clearly and consistently held that a taxpayer who trades securities for his own account, does not sell "to customers" within the meaning of § 1221(1).

Diamond's insistence that his increased financial and hourly commitment to securities trading in 1980 arguably rendered this activity a "trade or business," misses the crucial point that, whether or not his 1980 transactions amounted to a trade or business, he was not selling "to customers" for purposes of § 1221(1).[3] The "sale to customers" exclusion was added to the definition of capital assets in 1934 "so that a speculator trading on his own account could not claim the securities he sold were other than capital assets." *George R. Kemon*, 16 T.C. 1026, 1032 (1951). The amendment was premised on the theory that "those who sell securities on an exchange have no 'customers' and for that reason the property held by such taxpayers is not within the ... exclusionary clause." *Id. See also Gruver v. Commissioner*, 142 F.2d 363, 368 (4th Cir.1944) (the amendment made it "abundantly clear that a stock speculator buying and selling securities for his own account and not for resale

3. The trial court found that Diamond was an "investor" rather than a "trader" (and thus not in a trade or business) because, among other things, he did not spend the majority of his time trading securities. As Diamond correctly points out, however, a taxpayer may be engaged simultaneously in more than one business. *Oliver v. Commissioner*, 138 F.2d 910 (4th Cir.1943). If there was legal error in this, rather than an inadvertent failure fully to explicate the law being applied, the error was harmless. The existence of a trade or business does not conclude the issue under 26 U.S.C. § 1221(1); whether or not Diamond was involved in a securities trading business, he did not sell "to customers" and thus was subject to the limitation on deductibility of capital losses.

to customers was subject to the limitation on the deductibility of capital losses.").

In *Kemon,* the court explained the difference between dealers, who sell "to customers," and traders, who do not.

Those who sell "to customers" are comparable to a merchant in that they purchase their stock in trade, in this case securities, with the expectation of reselling at a profit, not because of a rise in value during the interval of time between purchase and resale, but merely because they have or hope to find a market of buyers who will purchase from them at a price in excess of their cost. This excess or mark-up represents remuneration for their labors as a middle man bringing together buyer and seller, and performing the usual services of retailer or wholesaler of goods. (Citations omitted.)

Contrasted to "dealers" are those sellers of securities who perform no such merchandising functions and whose status as to the source of supply is not significantly different from that of those to whom they sell. That is, the securities are as easily accessible to one as the other and the seller performs no services that need be compensated for by a mark-up of the price of the securities he sells. The sellers depend upon such circumstances as a rise in value or an advantageous purchase to enable them to sell at a price in excess of cost. Such sellers are known as "traders."

16 T.C. at 1032–33. *See also Currie v. Commissioner,* 53 T.C. 185, 199–200 (1969); *Verito v. Commissioner,* 43 T.C. 429, 442 (1965); *Adnee v. Commissioner,* 41 T.C. 40, 43 (1963); *Polachek v. Commissioner,* 22 T.C. 858, 862 (1954). Although the taxpayers in *Kemon* were partners in a firm engaged in large volume securities transactions, with two regular offices, a Pennsylvania dealer's license, and subscriptions to various services commonly used by brokers and dealers, the court concluded that they were "traders" entitled to treat their profits as capital gains because the firm, which had no salesmen or customers' accounts, and which never advertised itself as having securities on hand for sale, did not sell "to customers" within the meaning of § 1221(1). 16 T.C. at 1034.[4]

Diamond nevertheless argues that the relevant law is "problematical" because the government has taken the position, in other litigation, that a trader sells "to customers" through a broker. In *Groetzinger v. Commissioner,* 771 F.2d 269 (7th Cir.1985), the government observed, on brief, that a "securities trader does indeed offer securities for sale, either in person or through a broker acting as his agent ...." Although *Groetzinger* was decided several years after the returns in this case were filed, Diamond contends that his actual knowledge at the time of filing is irrelevant under *Critzer* if the law can be shown to be "vague or highly debatable."

The issue in *Groetzinger,* however, was not whether securities trading losses are subject to the limitation on deductibility of capital losses, but whether the taxpayer's full-time gambling activities amounted to a "trade or business" for purposes of 26 U.S.C. § 62(1), so that his gambling losses could be deducted from his gross gambling income in arriving at adjusted gross income. In an effort to distinguish gambling from securities trading, which has been held, under certain circumstances, to constitute a trade or business, the government merely argued that because "a trader does exchange an 'economic unit' with another person ... while a gambler does not," 771 F.2d at 276, the latter could not be involved in a trade or business under § 62(1). The government's position in that case is not "irreconcilable," as Diamond contends,

---

**4.** As the taxpayer's position in *Kemon* illustrates, of course, the trader/dealer distinction cuts both ways because capital gains treatment generally favors, and capital loss treatment generally disfavors, the taxpayer. Thus, a taxpayer's position in a particular case may be determined, at least in part, by whether the activity in question generated gains or losses in the relevant tax years. Correspondingly, the government's position may differ depending upon the same factor. This, of course, explains what Diamond attempts to characterize as "different positions" taken by the government on this matter, hence "uncertainty" in the law.

with the stance it has adopted here and which has prevailed without exception in other cases.

The government's position in this case merely reflects the well-settled rule that a trader buying and selling securities exclusively for his own account does not sell "to customers," whatever the volume or character of his transactions. Given the unequivocal, well-established legal distinction between dealers and traders, Diamond's obligation under § 1211 was clear, and the *Critzer* presumption that a taxpayer may lack the requisite intent to willfully falsify his returns because of the law's vagueness or debatability simply does not apply.

### III

■ Diamond argues, in the alternative, that the evidence at trial was insufficient to support his convictions under § 7206(1). We conclude to the contrary that the evidence, viewed in the light most favorable to the government, amply supports the trial court's determination of guilt.[5]

Diamond makes much of the fact that the government produced no direct evidence at trial to contradict his own testimony that the alleged false statements, including, in addition to the deduction of ordinary business losses in 1980 and their carry-over in 1981, the 1980 Schedule C business description ("wholesale dealer" in "agric. produce") and name ("individually and as Patrick Henry Farms"), the Schedule C deduction for personal state income taxes, and the 1981 political campaign contribution deducted in full as a "job reference cost," were inadvertently made. It is true that the government offered no direct evidence of intent, but this is of course seldom possible and never a requisite to finding the necessary culpability of mind beyond a reasonable doubt. The court expressly found that Diamond's own testimony, which was devoted largely to innocent explanations for the false returns, was not credible.

Moreover, there was substantial circumstantial evidence to support the trial court's conclusion that Diamond intended to file false returns. The evidence established, among other things, Diamond's education and professional experience, suggesting an extraordinary sophistication with respect to tax matters; that Diamond reported trading losses in prior and subsequent years as capital losses and caused his father so to report his losses from similar activity in 1980; that Diamond directed Robertshaw to withhold additional taxes from his wages toward the end of 1980 in order to avoid the estimated payment penalty he had incurred in prior years, suggesting that his decision to characterize and fully deduct his trading losses as ordinary losses was merely an afterthought; and, perhaps most important, the false characterization of his trading activity and business name on the 1980 Schedule C, suggesting that Diamond knew that accurate descriptions would trigger inspection and ultimate disallowance of the ordinary loss deductions by the Internal Revenue Service. On the record before it, the trial court could reasonably find beyond a reasonable doubt that Diamond acted willfully and therefore violated § 7206(1) as charged.

AFFIRMED.

---

**5.** Because we conclude that Diamond's statements were actually and unequivocally false, we need not reach the issue whether, as Diamond contends, 26 U.S.C. § 7206(1) is subject to the general rule that literal truth is a defense to perjury, *Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), and that, as a result, statements that merely imply an untrue fact or mislead the Internal Revenue Service do not violate the statute.