**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Steven M. WOOD, Defendant–Appellant.**

**No. 90–30211.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 8, 1991.

Decided Aug. 26, 1991.

Norman Sepenuk, P.C., Norman Sepenuk, Douglas Stringer, Portland, Or., for defendant-appellant.

Kris A. McLean, Asst. U.S. Atty., Helena, Mont., for plaintiff-appellee.

Before WRIGHT and O'SCANNLAIN, Circuit Judges, and MacBRIDE,* District Judge.

O'SCANNLAIN, Circuit Judge:

Wood appeals his conviction for tax evasion.

## I

In December 1983, Wood established an entity known as the S–M–W Investment Group out of an office in Kalispell, Montana. At approximately the same time, Wood created entities known as Rover Resources and Norcross. Wood and his employees advertised these companies as Canadian mining exploration penny stocks that, if successfully promoted, would be listed and publicly traded on the Canadian/Vancouver Stock Exchange. The funds solicited during the promotion of Norcross and Rover Resources—totaling approximately $250,000—were deposited into three trust accounts maintained by Wood. These funds, however, never made it to Canada. Rather, Wood converted these investors' funds to his own use and lost them playing the commodities futures market.

In 1986, the State of Montana charged Wood with various securities fraud and related crimes stemming from these transactions. Wood pleaded guilty to three selected counts pursuant to a plea agreement; imposition of sentence was deferred for a period of six years on the condition, among others, that he pay restitution to the Montana residents who purchased stock in Norcross or Rover Resources. Meanwhile, the State of Montana Securities Department contacted an IRS criminal investigator concerning Wood's embezzlement of investors' funds, suggesting possible tax liability. In August 1989, a federal grand jury brought a two-count indictment against Wood, charging him with two counts of tax evasion (violations of I.R.C. § 7201) for tax years 1983 and 1984, respectively.

Trial by jury commenced on April 9, 1990. On April 19, the jury found Wood guilty of the first count (tax year 1983), but acquitted him of the second count (tax year 1984). This appeal followed.

## II

### A

The elements of tax evasion, as proscribed by section 7201, are: "(1) the existence of a tax deficiency; (2) willfulness; and (3) an affirmative act constituting an evasion or attempted evasion of the tax." *United States v. Marashi*, 913 F.2d 724, 735 (9th Cir.1990) (quoting *United States v. Conforte*, 624 F.2d 869, 873 (9th Cir.), *cert. denied*, 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980)). It is the first element that is at issue here; Wood contends that he did not owe any additional taxes and that if the jury had been properly instructed, it likely would have acquitted him.[1]

At trial, Wood argued that his commodities-related trading losses were fully deductible as business losses under I.R.C. § 165(a) and (c),[2] and thus, his tax liability

---

* The Honorable Thomas J. MacBride, Senior United States District Judge for the Eastern District of California, sitting by designation.

1. We review the district court's formulation of jury instructions for an abuse of discretion, examining whether the instructions taken as a whole were misleading or represented a statement inadequate to guide the jury's deliberations. *United States v. Powell*, 936 F.2d 1056, 1064 (9th Cir.1991).

2. I.R.C. §§ 165(a) and (c) provide in pertinent part that:

 (a) General rule.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

 \* \* \* \* \* \*

 (c) Limitation on losses of individuals.—In the case of an individual, the deduction under subsection (1) shall be limited to—

 (1) losses incurred in a trade or business;

for the years 1983 and 1984 was insubstantial. The government, on the other hand, contends that the commodities losses were capital losses, and were subject to a limit on deductibility. *See* I.R.C. §§ 165(f), 1211.[3] Under the government's theory, Wood's tax liability for the years 1983 and 1984 would have been substantial.

The district court instructed the jury that:

> The existence of a trade or business is not determinative of whether the property is considered as a capital asset or not.... The primary issue is whether the property was held by the taxpayer primarily for the sale to customers.... [¶] Those who sell commodities on an exchange do not have customers within the meaning of Section 1221. [¶] If commodities futures are bought and sold by a taxpayer on his own account, primarily with the expectation of realizing profit due to price fluctuation rather than developing or finding a market for the sale to customers those commodity futures are treated as capital assets and not as property held primarily for sale to customers in the ordinary course of a trade or business.

Wood's objection to this instruction is three-fold. First, Wood argues that the instruction is incorrect as a matter of law; the existence of a trade or business is integral to the determination of whether property is or is not a capital asset. Second, Wood reasons that even if the existence of a trade or business is not integral as a matter of law, it was the role of the jury to decide which factor—"trade or business" or "sale to customers"—was dispositive. Finally, Wood contends that the language "those who sell commodities on an exchange do not have customers within the meaning of section 1221" is incorrect, as some sellers of commodities on an exchange might have customers.

## B

Section 1221 defines capital assets as "property held by the taxpayer (whether or not connected with his trade or business), but does not include ... property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." I.R.C. § 1221(1). To determine whether securities fall within the latter exception to capital asset treatment, courts have identified three classifications of purchasers of stocks or commodities futures—dealers, traders, or investors. *See generally King v. Commissioner*, 89 T.C. 445, 457–58 (1987). The tax liability of a seller of securities depends upon which classification best identifies the seller; dealers may qualify for this exception, while traders and investors do not.

A dealer is a person who purchases the securities or commodities with the expectation of realizing a profit

> not because of a rise in value during the interval of time between purchase and resale, but merely because they have or hope to find a market of buyers who will purchase from them at a price in excess of their cost. This excess or mark-up represents remuneration for their labors as a middle man bringing together buyer and seller, and performing the usual services of retailer or wholesaler of goods.

*Kemon v. Commissioner*, 16 T.C. 1026, 1032–33 (1951). Dealers have customers for purposes of section 1221. *See United States v. Diamond*, 788 F.2d 1025, 1029 (4th Cir.1986).

Traders, on the other hand, are sellers of securities or commodities who "depend upon such circumstances as a rise in value or an advantageous purchase to enable them to sell at a price in excess of cost." *Id.* at 1033. A trader performs no merchandising functions nor any other service

---

(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business.

**3.** I.R.C. § 165(f) provides that "[l]osses from sales or exchanges of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212." Section 1211, in turn, states in

relevant part that "[i]n the case of taxpayers other than a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gains from such sales or exchanges, plus (if such losses exceed such gains) the lower of—(1) $3,000, ... or (2) the excess of such losses over such gains."

which warrants compensation by a price mark-up of the securities he or she sells. *Id.* at 1032–33. "[A] trader will be deemed to be engaged in a trade or business if his or her trading is frequent and substantial." *King,* 89 T.C. at 458. Generally, both dealers and traders will be engaged in a trade or business; only a dealer, however, has customers.

An investor is very similar to a trader. Like a trader, an investor "makes purchases for capital appreciation and income." *King,* 89 T.C. at 459. Unlike a trader, however, an investor makes such purchases "usually without regard to short-term developments that would influence prices on the daily market." *Id.* An investor, on the other hand, will never be considered to be engaged in a trade or business with respect to his or her investment activities, no matter how extensive his or her activities might be. *Id.* at 459.

■ These distinctions have important tax consequences. A dealer in securities or commodity futures can take advantage of one of the section 1221 exceptions to capital asset tax treatment, as a dealer deals in property held primarily for sale to customers in the ordinary course of his or her trade or business. *Id.* at 458. However, since neither a trader nor an investor deals with customers, any security or commodity future-related loss or gain must be evaluated under the capital asset provisions. *See id.; see also Diamond,* 788 F.2d at 1028 ("courts have clearly and consistently held that a taxpayer who trades securities for his own account, does not sell 'to customers' within the meaning of § 1221(1)").[4]

■ In sum, Wood's losses might be fully deductible as business losses if he were a dealer but are only partially deductible as capital asset losses if he was a trader or investor. Thus, contrary to Wood's contentions, the question of whether Wood had a trade or business is not dispositive; rather, the primary issue is whether Wood sold the securities or commodity futures *to customers* in the ordinary course of business. *See Kemon,* 16 T.C. at 1032 ("Whether or not securities are held primarily for sale to customers in the ordinary course of business is a question of fact, in which the *crucial phrase is 'to customers.'* ") (emphasis added). The district court properly focused the jury's attention on "customers."[5]

## C

■ There is merit to Wood's contention that the instruction "those who sell commodities contracts on an exchange do not have customers within the meaning of § 1221" is unnecessarily sweeping. While the statement may be true in many instances, a bona fide dealer might trade on an exchange. *See King,* 89 T.C. at 457 ("One who regularly buys and sells on an exchange may be *either a dealer or a trader.*") (emphasis added). A dealer, by definition, has customers, even a dealer that buys and sells on an exchange.

Even if the instruction was incorrect, however, any error was harmless. Jury instructions are to be viewed as a whole, in context of the entire trial, to determine whether they were misleading or inadequate to guide the jury's determination. *United States v. Arvin,* 900 F.2d 1385, 1390 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 672, 112 L.Ed.2d 664 (1991). A conviction should not be reversed because of an allegedly incorrect instruction

---

**4.** The *King* Court so held only with respect to traders. However, "the distinction between a trader and an investor has no bearing on the determination of whether securities or commodity futures are capital assets in the hands of the particular taxpayer since such securities or commodity futures would be capital assets in the hands of either a trader or investor." *Michelson v. Commissioner,* T.C. Memo 1990–27.

**5.** Wood's contention that the question of focus— on "trade or business" versus "sale to custom-

ers"—belonged to the jury is frivolous. Matters of statutory interpretation are questions of law, *see United States v. Taylor,* 802 F.2d 1108, 1112 (9th Cir.1986), *cert. denied,* 479 U.S. 1094, 107 S.Ct. 1309, 94 L.Ed.2d 164 (1987), which may be presented to the jury as such, *see United States v. Flake,* 746 F.2d 535, 537–38 (9th Cir.1984), *cert. denied,* 469 U.S. 1225, 105 S.Ct. 1220, 84 L.Ed.2d 360 (1985). *See also Powell,* 936 F.2d at 1064 n. 3 ("[T]he district court is the jury's sole source of the law.").

as long as the instruction, when viewed as a whole in the context of the entire trial, fairly and adequately covered the issues in the case. *United States v. Pemberton*, 853 F.2d 730, 734 (9th Cir.1988).

Here, the only erroneous part of the instructions was the sentence regarding selling commodity futures on an exchange. The government never contended that Wood sold commodities on an exchange, depriving him of "customers" as a matter of law. The record is devoid of references to an exchange. Rather, the evidence, arguments by counsel, and instructions, as a whole, properly focused the jury on the key issue—whether Wood held the commodity futures for sale *to customers* in the ordinary course of business.[6]

The district court's instructions were, for the most part, correct. The sole misstatement was harmless.

### III

Wood urges that the district court erred in admitting into evidence a summary chart prepared by the government's expert, while excluding from evidence a summary chart prepared by the defense expert.

### A

Bob Marcinek, an agent with the Internal Revenue Service, testified as an expert on behalf of the government. Marcinek testified as to his opinion of Wood's tax liability, which he summarized in two charts. The government moved to admit the charts into evidence; the motion was granted without objection.

The defense offered its own expert, Larry Richter, to testify about Wood's tax liability. During the course of his testimony, Richter filled in a chart outlining his version of the correct tax calculations. Thereafter, Wood moved to admit the chart into evidence. The government objected, claiming that the chart was a "misapplication of the law." The district court sustained the government's objection. However, the court permitted Wood to use the chart during closing arguments, so long as the figures concerning business loss deductions were masked.

### B

"When considering the admissibility of exhibits of this nature, it is critical to distinguish between charts or summaries *as evidence* and charts or summaries *as pedagogical devices*." *Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 431 (5th Cir. 1985). Charts and summaries as evidence are governed by Federal Rule of Evidence 1006, which permits the introduction of charts, summaries, or calculations "of voluminous writings, recordings, or photographs which cannot conveniently be examined in court."[7] In contrast, charts or summaries of testimony or documents already admitted into evidence are merely pedagogical devices, and are not evidence themselves. *See Pierce*, 753 F.2d at 431; *see also United States v. Poschwatta*, 829 F.2d 1477, 1481 (9th Cir.1987) (describing such summary charts as "testimonial aids"), *cert. denied*, 484 U.S. 1064, 108 S.Ct. 1024, 98 L.Ed.2d 989 (1988).[8]

We have long held that such pedagogical devices should be used only as a testimonial aid, and should not be admitted into evidence or otherwise be used by the jury during deliberations. *See United States v. Soulard*, 730 F.2d 1292, 1300 (9th Cir.1984); *United States v. Abbas*, 504 F.2d

---

**6.** For example, during closing statements, the government argued this point as follows:

And this may be the issue where you need to employ further instructions, and that is, and I'll say it again, whether the commodities or securities futures contracts were held for resale to customers of the Defendant. What customers did the Defendant have? He had no customers. He was trading on his own account for his own profit for his own benefit. He wasn't buying and selling futures contracts to anyone. He wasn't buying a product, ..., and selling it to somebody else. He was

playing little games in a complex market with other people's money and lost it all. He didn't buy and sell to customers.

**7.** The Rule further provides that "[t]he originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place." Fed.R.Evid. 1006.

**8.** In *Powell*, we noted that *Poschwatta* had been overruled on other grounds by *Cheek v. United States*, — U.S. —, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991). *See Powell*, 936 F.2d at 1064 n. 3.

123, 125 (9th Cir.1974), *cert. denied,* 421 U.S. 988, 95 S.Ct. 1990, 44 L.Ed.2d 477 (1975). *But see Poschwatta,* 829 F.2d at 1481 (concluding that "[a]lthough the better practice may have been for the court to allow the charts to be used as testimonial aids only," court did not abuse its discretion in admitting charts into evidence). Thus, the district court's refusal to admit Richter's charts into evidence, standing alone, was not error. Rather, the decision fully comported with our prior admonitions regarding pedagogical devices.

Nonetheless, we agree with Wood that the disparate treatment between the government's summary charts and that of the defendant warrants explanation. Such explanation is readily apparent from the record. In *Soulard,* we explained that "[t]he trial court ... should carefully examine the summary charts to determine that everything contained in them is supported by the proof." 730 F.2d at 1300; *see also Abbas,* 504 F.2d at 124 (same). Richter offered only one reason for his calculation of Wood's "gains or losses": that Wood operated a trade or business, and thus, he was eligible for a business loss deduction. As previously noted, this analysis is incomplete; Wood was not entitled to a business loss deduction unless the property loss was held by Wood "primarily for sale to customers in the ordinary course of his trade or business." I.R.C. § 1221(1). Richter presented no evidence that Wood had customers. Thus, the chart was not supported by the proof. The district court did not err in masking the unsupported portion or in declining to admit the chart into evidence.

### IV

Finally, Wood challenges the admission into evidence of his prior state criminal prosecutions.

### A

 Shortly before trial, Wood filed a motion *in limine* asking the court to prohibit any reference to the Montana state criminal action brought against Wood. The government did not file a written opposition to the motion. Rather, at the motion

hearing, the government stated that it was not going to use the evidence in its case-in-chief, but that it "intend[ed] to use [the evidence] when and if Mr. Wood takes the stand to cross-examine him concerning his prior conviction which relates to the same set of facts, as I understand it, concerning his embezzlement which created income and tax problems." The court deferred any final ruling on the motion until after the government's case-in-chief.

After the government rested, the district court reconsidered—and denied—the motion. The court concluded:

> The thing that is impressive to me about this evidence, in fairness to the prosecution, is the fact that the Government's theory of the case is that your client embezzled those monies and did not report them as income. That they being in effect embezzled monies, were reportable income to him. The admission of this guilty plea proves an element of the Government's case, and it is a judicial, an extra judicial admission of a part of what the Government would have to prove. And in that respect, might even be admissible as part of the Government's case in chief or for use by the United States on rebuttal, for that matter. Totally apart from the rule here 609–A.

Thereafter, when Wood testified in his own defense, the government cross-examined him on the Montana "convictions," admitting the Information and Judgment and Conviction into evidence. Wood did not object to the introduction of the exhibits at that time.

Because Wood did not object at the time the convictions were admitted into evidence, the government contends that Wood did not preserve the issue for appeal and thus any alleged error must be reviewed under the plain error standard. However, Wood correctly notes that in *Palmerin v. City of Riverside,* 794 F.2d 1409 (9th Cir. 1986), we held that "where the substance of the objection has been thoroughly explored during the hearing on the motion *in limine,* and the trial court's ruling permitting introduction of evidence was explicit and definitive, no further action is required to preserve for appeal the issue of admissibility of that evidence." *Id.* at 1413. Here, the trial court's ruling prior to the start of

the defendant's case-in-chief was explicit and definitive. A contemporaneous objection to the introduction of the evidence was unnecessary.

### B

■ Wood contends that evidence of the state convictions was inadmissible under Federal Rule of Evidence 609(c).[9] Rule 609 permits introduction of prior convictions "[f]or the purpose of attacking the credibility of a witness." However, "[e]vidence of a conviction is not admissible under this rule if the conviction has been the subject of a pardon, annulment, certificate of rehabilitation, or other equivalent procedure based on a finding of the rehabilitation of the person convicted." Fed.R.Evid. 609(c)(1). In 1990, Wood petitioned for and received an order permitting him to withdraw his guilty pleas. This procedure is authorized by Montana Code section 46–18–204, which provides that:

> Whenever the court has deferred the imposition of sentence and after termination of the time period during which imposition of sentence has been deferred, upon motion of the court, the defendant, or the defendant's attorney, the court may allow the defendant to withdraw his plea of guilty or may strike the verdict of guilty from the record and order that the charge or charges against him be dismissed.... After the charge is dismissed, all records and data relating to the charge are confidential criminal justice information.

Wood reasons that this provision is an "equivalent procedure" for purposes of Rule 609(c) and, accordingly, the convictions should have been excluded under this rule.

The dispositive question is whether the "equivalent procedure" was "based on a finding of the rehabilitation of the person convicted." Fed.R.Evid. 609(c). Several facets of the Montana statute suggest that the Montana legislature was motivated by a desire to encourage rehabilitation. For example, the procedure may be employed only once in a person's lifetime. Mont. Code Ann. § 46–18–201(6). Likewise, such "dismissed" convictions are not " 'convictions' as contemplated by [Montana's] persistent felony offender statute." *State v. Gladue*, 209 Mont. 235, 679 P.2d 1256, 1259 (1984).

Rehabilitory motivation alone, however, is insufficient to trigger Rule 609(c). The Rule requires "a *finding* of the rehabilitation of the *person convicted*." Thus, courts have consistently upheld introduction of prior convictions under Rule 609 where the convictions were later expunged, even where the statute authorizing expungement was motivated by rehabilitation. *See, e.g., Smith v. Tidewater Marine Towing, Inc.*, 927 F.2d 838, 840 (5th Cir. 1991) (Louisiana Constitution's first-offender provision did not require showing of rehabilitation prior to invocation; thus, prior convictions set aside under this provision nonetheless admissible in federal court); *Wilson v. Attaway*, 757 F.2d 1227, 1244 (11th Cir.1985) (same, construing Georgia's first offender statute); *United States v. DiNapoli*, 557 F.2d 962, 966 (2d Cir.) (issuance of certificate of relief from disabilities does not take conviction out of Rule 609, even where "certificate should not issue unless the relief to be granted by the certificate is consistent with the rehabilitation of the first offender") (quotation omitted), *cert. denied*, 434 U.S. 858, 98 S.Ct. 181, 54 L.Ed.2d 130 (1977).[10]

The constitutional provision and statute at issue in *Smith* and *Wilson*, respectively, differ from the Montana statute in one important respect: each operates automatically, while the Montana statute's use of the word "may" suggests that the trial court has discretion as to whether to issue an order permitting withdrawal of a guilty plea. While there is of yet no Montana law

---

**9.** A district court's construction of the Federal Rules of Evidence is a question of law subject to plenary review. *United States v. Smith*, 924 F.2d 889, 895 (9th Cir.1991). Questions of the admissibility of evidence which involve factual determinations, rather than legal conclusions, are reviewed for an abuse of discretion. *Id.*

The district court's holding that Montana's statute did not implicate Rule 609(c) is a question of law. Accordingly, we review this conclusion de novo.

**10.** In *United States v. Pagan*, 721 F.2d 24 (2d Cir.1983), the Second Circuit held that a certificate setting a youthful offender's conviction pur-

on the subject, rehabilitation of the offender is undoubtedly one factor that a trial court may consider in deciding whether to issue the order. And, where a finding of rehabilitation is made by the trial court, the order would be an "equivalent procedure" for purposes of Rule 609(c). However, the record here does not reveal any such finding of rehabilitation. Accordingly, the convictions were admissible. *See United States v. Felix*, 867 F.2d 1068, 1074 n. 9 (8th Cir.1989) ("Because there is nothing in the record giving the reasons for the expungement of the convictions at issue here, there is no basis for concluding that Rule 609(c) makes these convictions inadmissible.").

AFFIRMED.

suant to the Youth Corrections Act, 18 U.S.C. §§ 5005–5026 (repealed 1987), was an "equivalent procedure" under Rule 609(c). Under the Act, any offender who obtained an unconditional discharge by the Youth Correction Division of the Board of Parole prior to the expiration of his or her sentence received an automatic set aside of his or her conviction. In holding that this procedure satisfied Rule 609(c), the court noted that the legislative history repeatedly stated that a youthful offender was not to be discharged early unless "[the offender's] rehabilitation has been accomplished." *Id.* at 29 (quoting H.R.Rep. No. 2979, *reprinted in* 1950 U.S.Code Cong.Serv. 3983, 3992).