Stephen MARRIN and Jane Marrin,
Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent–
Appellee.

Docket No. 97–4080.

United States Court of Appeals,
Second Circuit.

Argued March 9, 1998.

Decided June 9, 1998.

148

Stephen Marrin, Baldwin, NY, appearing Pro se.

Anthony T. Sheehan, Attorney, Tax Division, Department of Justice, Washington, DC (Ann B. Durney, Attorney, Loretta C. Argrett, Assistant Attorney General), for Respondent–Appellee Commissioner of Internal Revenue.

Before: OAKES, WALKER, and MAGILL,* Circuit Judges.

WALKER, Circuit Judge:

This is an appeal from the judgment of the United States Tax Court (Joseph Gale, *Judge*) affirming the decision of the respondent-appellee Commissioner of Internal Revenue ("Commissioner") that petitioners-appellants Stephen Marrin ("Marrin") and Jane Marrin (together, "the Marrins"), husband and wife taxpayers, were not entitled to deduct losses they suffered from trading in securities and futures as ordinary losses because the taxpayers did not trade on behalf of any customers.

* The Honorable Frank J. Magill, of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

The Commissioner issued a notice of deficiency to the Marrins, advising them that they owed taxes for the 1989 and 1990 tax years because the Marrins incorrectly reported losses sustained from securities transactions as ordinary losses on Schedule C of their income tax returns, rather than as capital losses on Schedule D of their returns. The Commissioner determined that the Marrins' losses were capital, not ordinary, because the securities and futures which Marrin traded were capital assets within the meaning of 26 U.S.C. § 1221, and not inventory held "primarily for sale to customers in the ordinary course of his trade or business," within the meaning of 26 U.S.C. § 1221(1). The Commissioner also determined that the Marrins had filed delinquent tax returns for those years, and assessed additional tax as a penalty pursuant to 26 U.S.C. § 6651(a)(1).[1] The Marrins, appearing *pro se*, filed a petition challenging the Commissioner's determination. The Tax Court affirmed the Commissioner's finding that the Marrins were not entitled to ordinary loss deductions on their 1989 and 1990 income tax returns for the transactions in question. They appeal that determination. We affirm and hold that whether or not Marrin was engaged in a "trade or business" within the meaning of 26 U.S.C. § 1221(1), he had no "customers" within the meaning of that section, and therefore is not entitled to ordinary loss treatment. We also conclude that the Marrins have not demonstrated reasonable cause for their failure to file their returns in a timely manner and affirm the additional tax imposed by the Commissioner.

## BACKGROUND

The facts upon which our opinion rests are not in dispute. Between 1969 and 1989, Marrin was employed as a securities trader. In 1978, he became a registered securities principal, and in 1983, he began a securities firm, Egan Marrin and Rubano, Inc. ("EMR"). During this period, all of the firms at which Marrin worked were registered broker-deal-

1. Although referred to as additions to tax, these amounts constitute a penalty for late filing. *See* 26 U.S.C. § 6651(a)(1).

ers, and he undertook transactions on their behalf. At times, he also purchased and sold securities and futures for his own account.

In 1987, Marrin left EMR. In October 1988, he commenced full-time employment as a registered securities principal with Cadre Consulting Services, Inc. ("Cadre"), a registered broker-dealer. While an employee at Cadre, he continued to trade for his own account. In making trades for his own account, he began to use the "on the book" bid and asked method. Marrin would place orders to buy securities and to sell securities with his broker at specified bid and asked prices respectively, depriving his brokers of any discretion in handling the transactions. He attempted to set his prices at levels slightly better than those prevailing on the market in order to profit from the spread between his bid and asked prices.[2] Whenever his bid or asked price was the best for a particular security, it was displayed on the ticker of the appropriate securities exchange. When Marrin traded securities for his own account, he did so only through registered broker-dealers to whom he paid commissions.

In March 1989, Marrin left his job as a registered securities principal for Cadre. He was unemployed until November 1989, when he began working full-time for Overseas Shipyards, Inc. ("Overseas") in a position unrelated to the securities industry. During 1989, Marrin continued to trade for his own account in both securities and futures. During 1990, he continued his full-time employment at Overseas and continued to trade for his own account. All of his 1990 trades were in securities; none were in futures. During both years, all of his trades were for his own account, and all were made through registered broker-dealers. Throughout this period, Marrin spent upwards of 40 hours at home each week researching trades and devising trading strategies; however, he was not licensed as a securities dealer, did not

advertise himself as a securities dealer, and did not have an established place of business for conducting securities transactions.

The Marrins filed for automatic extensions to file their 1989 and 1990 returns, making them due on August 15, 1990 and August 15, 1991, respectively. However, neither return was filed until April 15, 1992. On the Marrins' 1989 return, Marrin reported $35,056 in wages, $5,635 in unemployment income, $6,441 in interest and dividend income, and a $100,000 pension distribution. He reported losses of $224,355 from his securities and futures transactions, which he claimed as an ordinary loss on Schedule C of his 1989 return. On the Marrins' 1990 return, Marrin reported income of $52,062 in wages, $3,566 in interest and dividend income, and $152,000 from an individual retirement account distribution from which no federal income tax was withheld. He again used Schedule C to report ordinary losses in the amount of $98,378 from his securities transactions.

On December 8, 1994, the Commissioner sent the Marrins a Notice of Deficiency, pursuant to 26 U.S.C. § 6212, advising them that they owed taxes for 1989 and 1990 because they had incorrectly reported losses sustained from securities transactions as ordinary losses on Schedule C of their income tax returns, rather than as capital losses on Schedule D of their returns. The Commissioner determined that the Marrins' securities were capital assets and that, because the securities and futures which Marrin traded were not inventory held primarily for sale to customers in the ordinary course of trade or business, their trading losses were capital losses. *See* 26 U.S.C. § 1221(1). The Commissioner also imposed additions to tax because the Marrins had not filed their 1989 and 1990 returns in a timely fashion. *See* 26 U.S.C. § 6651(a)(1).[3]

---

**2.** For example, if a stock were trading at 5½/6½, an investor could sell his shares at $ 5½ per share or buy more shares at $ 6½ per share. Through his broker, Marrin would offer to buy a certain number of shares at $ 5¾, beating the market price. He would then offer, through his broker, to sell his shares at $ 6¼, thereby offering a discount to those investors who wanted to buy the stock. Mr. Marrin's profit was the ½ dollar

difference between his $ 5¾ purchase price and $ 6¼ sale price.

**3.** The deficiency was assessed at $28,341 for 1989 and $31,777 for 1990. In addition, the Marrins were penalized $1,305 for 1989 and $8,009 for 1990 for their late filings.

On February 22, 1995, Marrin filed a petition in the Tax Court challenging the Commissioner's determination. At a bench trial in March 1996, Marrin argued to the Tax Court that he was entitled to ordinary loss deductions for the losses he sustained in 1989 and 1990 because he functioned not as an ordinary trader who invested capital by buying stock, but as a dealer, as evidenced by the frequency of his transactions, the high dollar volume involved, the short duration of his holdings, the extensive time he devoted to the endeavor, and his unique trading methods.

On January 14, 1997, the Tax Court issued its opinion affirming the Commissioner's determination. It found that the Marrins' losses were capital, rather than ordinary, because Marrin did not have "customers" within the meaning of 26 U.S.C. § 1221(1). The court also found that Marrin's dealings in futures were not "hedges" entitled to ordinary-loss treatment under *Corn Prod. Ref. Co. v. Commissioner*, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955). Finally, the court upheld the Commissioner's imposition of additions to tax as a penalty for late filing because the Marrins had failed to show "reasonable cause," within the meaning of 26 U.S.C. § 6651(a)(1), for their delay in filing their returns. On April 11, 1997, the Marrins filed a notice of appeal from the Tax Court's decision.[4]

## DISCUSSION

### I. *Standard of Review*

As a preliminary matter, we consider by what standard the Tax Court's rulings must be reviewed. Decisions of the Tax Court are reviewed in the same manner and to the same extent as are decisions of a district court in civil actions tried without a jury. 26 U.S.C. § 7482(a)(1). While the issue whether securities held by a taxpayer are capital or ordinary assets normally presents an issue primarily of fact, not to be set aside unless clearly erroneous, *see Van Suentendael v. Commissioner*, 152 F.2d 654, 654 (2d Cir.

1945) (per curiam), no factual aspect of the question is disputed here. We are asked to review the Tax Court's determination that the undisputed facts qualify the Marrins' securities losses as capital rather than ordinary under § 1221 and the cases interpreting it. We therefore review the district court's decision *de novo*. *See Follum v. Commissioner*, 128 F.3d 118, 119 (2d Cir.1997).

### II. *Securities Transactions*

The general rule is that a taxpayer may deduct all ordinary losses from income. *See* 26 U.S.C. § 165. However, losses from the sale or exchange of capital assets are only deductible to the extent allowed under 26 U.S.C. §§ 1211 and 1212. Under § 1211(b), an individual taxpayer may deduct a capital loss up to the amount of the taxpayer's capital gains plus, if losses exceed gains, additional capital losses up to a maximum of $3,000 (or $1,500 for married individuals filing separately). 28 U.S.C. § 1211(b). If capital losses exceed capital gains by more than the maximum amount, the excess may be carried over to later taxable years. 26 U.S.C. § 1212(b). Thus, characterization of a loss as ordinary or capital may have considerable tax consequences. In the present case, by treating their securities losses as ordinary rather than capital losses, the Marrins were able to shelter all of their income in 1989 and 1990 from any tax liability whatsoever.

The tax code defines capital losses as those realized on the sale or exchange of capital assets. *See* 26 U.S.C. § 1222; *Arkansas Best Corp. v. Commissioner*, 485 U.S. 212, 223, 108 S.Ct. 971, 99 L.Ed.2d 183 (1988). Section 1221 defines capital assets broadly as "property held by the taxpayer (whether or not connected with his trade or business)," unless it fits within one of five exceptions. 26 U.S.C. § 1221; *Arkansas Best*, 485 U.S. at 215, 108 S.Ct. 971. Section 1221(1), the only exception that could apply here, provides in pertinent part that property is not a capital asset if it is:

---

4. In addition to challenging the Tax Court's findings, the Marrins argue that § 1221 unconstitutionally confers preferential tax status on registered broker-dealers. He did not raise this argument in the Tax Court, and we will not consider it for the first time on appeal. *See Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522, 527 (2d Cir.1990).

stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business[.]

26 U.S.C. § 1221(1).

■ At issue in this case is whether Marrin had "customers" within the meaning of § 1221(1). Under this section, even if Marrin was engaged in the "trade or business" of selling securities, his losses are capital losses unless the "sale [of securities] to customers" was part of "the ordinary course of [that] trade or business." *Id.; see also Van Suetendael,* 152 F.2d at 654; *Swartz v. Commissioner,* 876 F.2d 657, 659 (8th Cir.1989) (per curiam) ("even if [taxpayer] were in the business of trading in commodities," his commodities futures were capital assets if "he had no 'customers' within the meaning of section 1221"). Significantly, the phrase "to customers" was added to the predecessor of § 1221(1) in the Revenue Act of 1934, ch. 277, 48 Stat. 680, to deny ordinary loss treatment to speculators in securities and to make it "impossible to contend that a stock speculator trading on his own account is not subject to the [capital loss limitation] provisions." H.R. Conf. Rep. No. 73–1385, at 22 (1934), *reprinted in* 1939–1 C.B. (Part 2) 627, 632. *See also United States v. Diamond,* 788 F.2d 1025, 1027 (4th Cir.1986)(" 'sale to customers' exclusion was added to the definition of capital assets in 1934 'so that a speculator trading on his own account could not claim the securities he sold were other than capital assets' ") (quoting *Kemon v. Commissioner,* 16 T.C. 1026, 1032, 1951 WL 150 (1951)); *Mirro–Dynamics Corp. v. United States,* 374 F.2d 14, 16 (9th Cir.1967).

In determining whether or not a securities trader has customers, a distinction should be drawn between dealers and traders. As the Ninth Circuit Court of Appeals has explained:

A dealer is a person who purchases the securities or commodities with the expectation of realizing a profit "not because of a rise in value ... but merely because they have or hope to find a market of buyers who will purchase from them at a price in excess of their cost. This excess or mark-up represents remuneration for their labors as a middle man bringing together buyer and seller,...." Dealers have customers for purposes of section 1221.

*United States v. Wood,* 943 F.2d 1048, 1051 (9th Cir.1991) (quoting *Kemon,* 16 T.C. at 1032–33). In contrast to dealers, traders

are sellers of securities or commodities who "depend upon such circumstances as a rise in value or an advantageous purchase to enable them to sell at a price in excess of cost." A trader performs no merchandising functions nor any other service which warrants compensation by a price mark-up.

*Id.* at 1051–52 (quoting *Kemon,* 16 T.C. at 1033). " 'A trader will be deemed to be engaged in a trade or business if his or her trading is frequent and substantial.' " *Id.* at 1052 (quoting *King v. Commissioner,* 89 T.C. 445, 458, 1987 WL 45153 (1987)). However, while "both dealers and traders [may] be engaged in a trade or business[,] only a dealer ... has customers." *Id.*

The Commissioner and the Tax Court properly concluded that Marrin was a trader and not a dealer entitled to claim ordinary loss treatment for his securities transactions. Marrin traded with the goal of earning short-term profits based on the difference between market prices and his bid and asked prices; any income he earned depended on increases in the value of securities he owned or advantageous purchases and sales. He did not earn commissions based on trades on another's behalf; in fact, he conducted *no* trades on another's behalf. Instead, he traded "on his own account" and thus "could not claim the securities he sold were other than capital assets." *Kemon,* 16 T.C. at 1032.

The Marrins' reliance on our decision in *Commissioner v. Stevens,* 78 F.2d 713 (2d Cir.1935), is misplaced. In *Stevens,* we found that a broker could be regarded as a customer of a securities dealer under certain circumstances; we based our holding, however, on the fact that the taxpayer had an established place of business, held himself out to the general public as a securities dealer, and

dealt primarily in the securities trade for his livelihood. *Id.* at 714. Generally, where a taxpayer trades on his own account and sells securities to persons he does not know, the purchasers are "not his customers, but customers of the brokers who bought of him." *Seeley v. Helvering,* 77 F.2d 323, 324 (2d Cir.1935).

We note also that most of the Marrins' evidence, such as Marrin's extensive trading activity, are relevant primarily to determining whether he was engaged in a trade or business, not to determining whether he had "customers." *See, e.g., Gajewski v. Commissioner,* 723 F.2d 1062, 1065 (2d Cir.1983) (identifying factors to be considered in determining whether a taxpayer is engaged in a trade or business within the meaning of 26 U.S.C. § 62(1)). To be sure, the inquiries are not entirely independent. For example, a taxpayer trading securities for commissions on behalf of a large number of customers is more likely to be engaged in a trade or business than is a similar taxpayer with fewer customers. However, the inquiries are conceptually distinct: a taxpayer does not have customers simply because he engages in many trades. In light of our conclusion that Marrin had no customers, we need not decide whether he was engaged in a trade or business. In sum, the Marrins' securities were capital assets, and their losses were capital losses, despite the size, frequency, or nature of the trades.

### III. *Futures Transactions*

■ The Marrins argue that the significant losses they suffered from futures in 1989 were properly reported as ordinary losses because Marrin traded in futures as a "hedge" against his risk of loss in other securities transactions. In making this argument, they rely on *Corn Products,* where the Supreme Court held that futures contracts are capital assets unless they are an integral part of a business's inventory-purchase system. *See* 350 U.S. at 50, 76 S.Ct. 20. Unlike Marrin, however, the taxpayer in *Corn Products* purchased corn futures primarily to ensure a ready supply for its operations and to protect against market shortages. *Id.* at 48, 76 S.Ct. 20. In *Arkansas Best,* the Court

clarified that *Corn Products* stood "for the narrow proposition that hedging transactions that are an integral part of a business' inventory-purchase system fall within the inventory exclusion of § 1221." 485 U.S. at 222, 108 S.Ct. 971.

Securities cannot be classified as "stock in trade" or "inventory unless they were held by the taxpayer primarily for sale to customers." *Van Suetendael,* 152 F.2d at 654. As we have discussed, Marrin had no customers. Therefore, he had no inventory within the meaning of § 1221 and his purchases of futures cannot be characterized as an "integral part of [an] inventory-purchase system." *Arkansas Best,* 485 U.S. at 222, 108 S.Ct. 971. Thus, the Tax Court did not commit clear error in determining that the Marrins' losses from futures were not the result of hedging transactions, but were capital losses subject to the capital-loss limitation.

### IV. *Additional Tax for Late Filing*

■ The Marrins argue that the Tax Court erred in affirming the Commissioner's imposition of an additional tax as a penalty for failing to timely file tax returns in 1989 and 1990. He argues that he reasonably believed he owed no taxes in either year, and that his lateness was due to incapacitation. We disagree.

■ Failure to file a tax return on the date prescribed results in a mandatory penalty unless the taxpayer shows that the failure was due to reasonable cause and not willful neglect. *See* 26 U.S.C. § 6651(a)(1); *McMahan v. Commissioner,* 114 F.3d 366, 369 (2d Cir.1997). Generally, factors that constitute "reasonable cause" include unavoidable postal delays, death or serious illness of the taxpayer or a member of his immediate family, or reliance on the mistaken legal opinion of a competent tax adviser, lawyer, or accountant that it was not necessary to file a return. *McMahan,* 114 F.3d at 369. Whether a factor constitutes "reasonable cause" for late filing under § 6651(a)(1) is reviewed *de novo.* Whether a factor is present in a particular case is reviewed for clear error. *Id.*

As noted by the Tax Court, Marrin's mistaken belief that it was unnecessary to file a

return was not based on "competent advice." Moreover, the fact that Marrin continued his non-securities employment and was actively engaged in securities and futures transactions during the relevant period undermines Marrin's claim that he was so incapacitated that he could not file the income tax returns. Therefore, the Tax Court properly concluded that the Marrins failed to show reasonable cause for their delay in filing.

## CONCLUSION

The judgment of the Tax Court is affirmed.