RUSSELL M. FRANKEL AND JULIA A. FRANKEL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Frankel v. Commissioner
Docket No. 5077-86.
United States Tax Court
T.C. Memo 1989-39; 1989 Tax Ct. Memo LEXIS 36; 56 T.C.M. (CCH) 1156; T.C.M. (RIA) 89039; January 25, 1989. George W. Connelly, Jr. and Harold A. Chamberlain, for the petitioners. Marion S. Friedman and Marilyn S. Ames, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioners' Federal income taxes for the following taxable years: Taxable Year
Petitioner(s)
Deficiency
1975
Russell M. Frankel
$     119.95
1977
Russell M. Frankel
39,418.49
1977
Julia A. (Tennant) Frankel
5,564.51
1978
Russell M. and Julia A. Frankel
52,105.44
1979
Russell M. and Julia A. Frankel
64,153.52
1980
Russell M. and Julia A. Frankel
77,549.62
1981
Russell M. and Julia A. Frankel
152,691.18
1982
Russell M. and Julia A. Frankel
5,169.39
After concessions by both parties, the issue remaining for *37 decision is the character of losses incurred by petitioner Russell M. Frankel in the trading of securities. FINDINGS OF FACT Some of the facts of this case have been stipulated and are so found. The stipulations of facts and accompanying exhibits are incorporated by this reference. Petitioners resided in Houston, Texas, at the time of the filing of the petition in this case. Prior to their marriage in 1978, Julia A. Frankel's maiden name was Tennant. In June 1971, after graduating from the Alfred P. Sloan School of Management at Massachusetts Institute of Technology, Mr. Frankel (hereinafter petitioner) began his employment with Fayez Sarofim & Co. (hereinafter Sarofim), an investment counseling firm in Houston, Texas. Initially, petitioner conducted the day-to-day trading in the bond market and eventually became vice president and principal of Sarofim. Through 1976, petitioner did little work at Sarofim in U.S. Treasury issues and Government National Mortgage Association backed securities (GNMA's). As a strategist and trader, it was not necessary for petitioner to be licensed as a dealer or a broker in handling transactions for Sarofim. In the course of his employment *38 at Sarofim, petitioner would spend 7 to 8 hours a day familiarizing himself with developments in the bond market. He became acquainted with the personnel of every major securities firm and he made a concerted effort to develop a rapport with them to make sure that he was getting the proper execution of his trades, proper exposure to current information, and proper opportunities for Sarofim's clients. Some of the individuals petitioner became familiar with included the personnel who handled the trading for primary dealers of U. S. Government securities. [1]
Petitioner and another associate at Sarofim, Robert Parker (Parker), decided in 1976 to focus on trading GNMA's on a short-term personal business level -- one that would not compete with what they were doing at Sarofim. Their decision to trade in GNMA's was based in part on the new market that had been created in GNMA's and its unusual characteristics. *39 Petitioner believed that the low volume and inefficient operation of this market provided an opportunity for profit on a short-term trading basis. There existed no established exchange for the trading of GNMA's; therefore, all trades were conducted by telephone between a buyer and a seller. Petitioner traded these securities with the primary dealers in the market. These primary dealers were willing to trade with petitioner because they knew petitioner and had confidence in petitioner's expertise and ability to finance each trade, regardless of the size of the trade. Due to a lack of capital in 1976, petitioner worked for his father on a commission basis in the purchase and sale of GNMA's. Petitioner's father financed this activity and agreed to split any profits with petitioner while absorbing all of the losses. Petitioner reported $ 452,448.71 as ordinary income in 1976 with respect to the commissions earned in the purchase and sale of GNMA's. Each trade was made with the consultation of Parker and made through accounts held in Parker's name. In 1977, petitioner began trading for his own account although he continued to utilize Parker's accounts. Petitioner and Parker decided *40 to upscale operations and convinced Stedman Adams (Adams) to work as a trader for them. Office space was leased from which Adams executed all of the trades and which contained knock-down lines, a Telerate machine, and furniture from petitioners' and Parker's homes. Adams executed all of the purchases and sales of securities for petitioner and Parker and handled all of the administrative details of those trades until 1981 when he left petitioner's employ to join E. F. Hutton. Petitioner, however, made the final decision as to the trades that were made. In all but one transaction made from 1977 through 1982, petitioner purchased from and sold back to the same primary dealer before the settlement date. During 1977, petitioner purchased GNMA futures contracts. Petitioner closed his positions before settlement date for each trade made, and thus was never required to take or make delivery of the GNMA's. During 1977, petitioner closed out his position in every trade with the same primary dealer whom initial purchase or sale was made. Petitioner's losses from this trading activity in 1977 totalled $ 427,343, which depleted petitioner's capital and forced him from the market. Petitioner *41 liquidated trust assets and borrowed money from his father in an effort to avoid default with each primary dealer he traded with. Petitioner reentered the GNMA futures market in 1979, and made purchases with 1980 settlement dates. In each trade, the purchase and sale were made with the same primary dealer. Petitioner's losses from trades having a trade date in 1979 totalled $ 628,906.25. As a result of these losses, petitioner ceased trading GNMA futures contracts. Seven months later, in March 1980, petitioner made a short sale of September 1980 U.S. Treasury Bonds (T-Bonds). The next day, petitioner closed out his position by making four purchases through the same primary dealer and sustaining a loss of $ 124,750. Petitioner subsequently ceased his trading activity for 4 months. When petitioner reentered the market, he ceased trading in GNMA's and began trading in U.S. Treasury securities. His decision to switch trading activities was due to the fact that the GNMA market had become more efficient and the opportunity for profit was much better in T-bonds. Petitioner ceased dealing through accounts held in the name of Parker and conducted the purchase and sale of U.S. Government *42 securities through the following accounts: Tax Year
Broker
Account Number
1980
Donaldson, Lufkin & Jenrette
113 H0736 01760
Securities Corporation
1980
Goldman, Sachs & Co.
014-74790-144
1980, 1981
Smith Barney,
028852562
Harris Upham & Co.
1982, 1983
E. F. Hutton & Company
H2400270
1984, 1985
E. F. Hutton & Company
H2498610
In opening these accounts, petitioner signed documents reflecting his status as a customer of each of these securities firms. In July of 1980, petitioner executed two transactions. In the first transaction, petitioner purchased and sold T-Bonds with Smith Barney, Harris Upham & Co. sustaining a loss of $ 10,625. Petitioner purchased U.S. Treasury Notes (T-Notes) in the second transaction but failed to close out his position before settlement. Thus, petitioner had to finance this transaction with a repurchase agreement and sustained a loss of $ 153,125. This was the first and the only time that petitioner held the security beyond the settlement date and the only time that petitioner sold a security to a primary dealer other than the one from whom he purchased the security. Petitioner ceased trading until *43 February of 1981 at which time he executed a trade in T-Bonds, sustaining a loss of $ 25,000. Once again, petitioner ceased his trading activity until December of 1982 at which time petitioner purchased T-Notes and T-Bonds and closed out his position in each transaction, thereby realizing a gain in three of the four transactions totalling $ 40,000. During 1982 and through 1985, petitioner traded exclusively with E. F. Hutton through Adams. Petitioner terminated his trading activities in 1985. From a period of 1977 through 1982, petitioner made 24 trades, none of which were for long-term appreciation or for interest or dividends to be earned. In 1977, the longest a position was held open was 3 months and 5 days, and in 1979, 27 days. Thereafter, only one trade was held open longer than 1 day. The Commissioner determined that for the taxable years 1980 and 1981, petitioners' losses from securities transactions were capital losses rather than losses attributable to a trade or business. In addition, the Commissioner determined that petitioners' gain for the taxable year 1982 was a capital gain and not attributable to a trade or business. As a result of these determinations, *44 the Commissioner mailed a notice of deficiency to Russell M. Frankel for the taxable years 1975 and 1977, disallowing an investment tax credit carryback from 1978 to 1975 and disallowing a net operating loss carryback from 1980 to 1977. A notice of deficiency was mailed to Julia A. Tennant for the taxable year 1977, disallowing a net operating loss carryback from 1980 to 1977. In addition, a notice of deficiency was mailed to Russell M. and Julia A. Frankel for the taxable years 1978 through 1982, disallowing a net operating loss carryback from 1980 to 1978 and 1979, and disallowing a net operating loss carryforward from 1980 to 1981 and 1982. OPINION Section 1221[2] defines capital assets as: * * * property held by the taxpayer (whether or not connected with his trade or business), but does not include -- (1) * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; Under section 1221, we have found that securities as well as commodity futures contracts are capital assets even though a taxpayer may be in a trade or business *45 with respect to his dealing in such securities. King v. Commissioner,89 T.C. 445 (1987); Vickers v. Commissioner,80 T.C. 394 (1983). The exception to this, as set forth above, is where the taxpayer holds the property "primarily for sale to customers in the ordinary course of his trade or business." Petitioners argue at great length in their brief that petitioner was in the trade or business of trading securities. Respondent has not conceded this issue but argues that, not only was petitioner not engaged in a trade or business, but that such analysis is irrelevant in the instant case to the ultimate characterization of petitioners' losses. We agree with the latter half of respondent's argument. Our analysis is limited solely to the issue before us -- the character of petitioners' losses, and we need not address whether petitioner was engaged in a trade or business of trading securities. Petitioner's securities are capital assets under section 1221, unless under section 1221(1) *46 the primary dealers, to whom petitioner purchased and sold securities, were petitioner's "customers." In determining whether a seller of securities sells to "customers," the merchant analogy has been employed. Those who sell "to customers" are comparable to a merchant in that they purchase their stock in trade, in this case securities, with the expectation of reselling at a profit, not because of a rise in value during the interval of time between purchase and resale, but merely because they have or hope to find a market of buyers who will purchase from them at a price in excess of their cost. This excess or markup represents remuneration for their labors as a middle man bringing together buyer and seller, and performing the usual services of retailer or wholesaler of goods. Such sellers are known as "dealers." Contrasted to "dealers" are those sellers of securities who perform no such merchandising functions and whose status as to the source of supply is not significantly different from that of those to whom they sell. That is, the securities are as easily accessible to one as the *47 other and the seller performs no services that need be compensated for by a markup of the price of the securities he sells. The sellers depend upon such circumstances as a rise in value or an advantageous purchase to enable them to sell at a price in excess of cost. Such sellers are known as "traders." [Kemon v. Commissioner,16 T.C. 1026, 1032-1033 (1951); citations omitted.] Petitioner does not fall within the definition of a dealer. [3] Petitioner's testimony is replete with statements regarding how petitioner felt he could take advantage of short-term moves in the bond market. His objective was to profit by anticipating the movement of the market. This type of trading is not representative of a middle man who brings together a buyer and a seller. Moreover, in all but one trade, petitioner bought from and sold to the same primary dealer. However, it is petitioner's testimony regarding his intent in entering the GNMA market which clearly places him outside of the definition of a dealer. Petitioner stated: GNMA's, on the other hand, were brand new. I don't think they had started much before '74. I could be wrong, but I remember the volume statistics in *48 '76, and they were very low, and basically it was an inefficient market, which we figured, by definition, provided unique opportunities to an expert investor that we perceived ourselves to be. In addition, we felt that the GNMA market was unusual in another consideration. It was a growing market, and a lot of new securities were being issued, but in general it wasn't a very liquid market, because a lot of people didn't buy them. * * * The primary buyers were mortgage bankers, savings and loans; to an extent, pension funds; things like that, but as a result, that provided another unique opportunity. * * * So therefore you had a small market, a limited number of players,and a lot of stuff really not available for resale if the market went against you. And we figured that that -- the overall inefficiencies provided a unique opportunity. Petitioner perceived the GNMA market as a unique opportunity to take advantage of its inefficiencies and thereby profit. Thus, not only did petitioner make speculative *49 trades, but in addition, petitioner entered the GNMA market with this specific intent. The fact that petitioner did not trade on an organized exchange, but rather dealt directly with the primary traders, is of no consequence due to the fact that there existed no GNMA exchange. We do not believe that this investment strategy was the kind anticipated in Kemon to be typical of a merchant of securities. Petitioner was a trader, not a dealer, and the primary dealers with whom petitioner traded were not his "customers," rather, he was theirs. Petitioners would have us look to a myriad of other factors in defining a trader and a dealer. However, we point out that, unlike a dealer, a trader has no "customers" and trades only on his own account. However, the trading activity in which traders engage may resemble the activity of a dealer in every other respect. It is possible that the trading activity of a trader may rise to the level of a trade or business of selling securities, but, nevertheless, such sales still produce capital gains and losses. King v. Commissioner, supra at 457. The distinguishing characteristic between a trader and a dealer is the presence *50 of "customers." Petitioners contend that the concept of "customer" is one that is intended to be broadly construed as any person who buys an asset from another person. They cite Estate of Hall v. Commissioner,29 B.T.A. 1255, 1260 (1934), affd. sub nom. Commissioner v. Stevens,78 F.2d 713 (2d Cir. 1935). The sole issue in Estate of Hall was whether a partnership was entitled to inventory, at market, its unsold securities on hand at the end of the calendar years 1929 and 1930 in computing net income for those years. Respondent determined that the partnership was not "a dealer in securities" and therefore was not entitled to use inventories in computing net income for tax purposes. Respondent's principal argument was that the partnership did not make sales of its securities to "customers." Estate of Hall is distinguishable on its facts from the present proceeding. In the instant case, we have found that petitioner was not a dealer, but was engaged primarily in speculation or capitalizing on advantageous market movements, as opposed to merchandising securities. An entirely different situation was present in Estate of Hall. The *51 partnership in Estate of Hall was "clearly shown by the evidence to have dealt in the stocks involved primarily as a merchant. While it purchased through brokers who were members of the stock exchange and sold to brokers as principals or customers, it held itself out as a merchant of securities * * *. It also purchased from and sold to others than brokers." Estate of Hall v. Commissioner, supra at 1260 (original emphasis). Unlike Estate of Hall, petitioner has not shown by uncontradicted evidence that he purchased securities not for the purpose of speculation, but solely to resell to "customers" at a profit. Finally, petitioners argue that having a large "customer" to whom most of one's sales are directed satisfies the definition of "customer." We do not dispute petitioners' argument that a single entity may be a "customer" within the meaning of section 1221(1). However, in the instant case this statement must be read in light of the merchant analogy in deciding whether a seller of securities sells to "customers." A seller of securities who does not perform a merchandising function -- who does not act as a middle man bringing buyer and seller *52 together -- is considered a trader, and as such, not even the broadest array of vendees will be his "customers." Based upon the foregoing analysis, we find that petitioner was a trader in securities within the meaning of section 1221(1). As a result, the securities purchased and sold by petitioner resulting in the losses sustained in 1980 and 1981 and the income realized in 1982 were capital assets. After concessions by both parties, Decision will be entered under rule 155.
Footnotes
1. There were approximately 36 primary dealers in the United States at the time of trial. To attain the status of a primary dealer, a dealer in securities must conduct a certain percentage of business in the auctions of Government securities and apply for recognition of that status.↩
2. Unless otherwise indicated, all section numbers refer to the Internal Revenue Code in effect for the taxable years 1975, 1977, 1978, 1979, 1980, 1981, and 1982.↩
3. Petitioner's testimony reflects that he was not an investor as he did not hold the securities for long-term appreciation or for interest or dividends to be earned.↩