T.C. Memo. 1998-394


UNITED STATES TAX COURT


GARY K. BIELFELDT AND CARLOTTA J. BIELFELDT, ET AL.,[1] Petitioners
<u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 5936-96, 6080-96,    Filed November 6, 1998.
6154-96, 6155-96,
6156-96, 7264-96,
7265-96, 7346-96.

<u>Timothy C. Frautschi</u>, <u>Maureen A. McGinnity</u>, <u>Elizabeth Staton Idleman</u>, <u>Lloyd J. Dickinson</u>, and <u>Wayman C. Lawrence, IV</u>, for petitioners.

<u>Alan M. Jacobson</u>, <u>Joseph T. Ferrick</u>, and <u>David D. Choi</u>, for respondent.

---

[1]Cases of the following petitioners have been consolidated for purposes of trial, briefing, and opinion:  docket No. 6080-96, Bielfeldt & Company Profit Sharing Plan and Trust, Bank One, Peoria, Trustee, and Bielfeldt & Company, a general partnership, by Gary K. Bielfeldt; docket No. 6154-96, Linda S. Bielfeldt; docket No. 6155-96, David L. & Julie K. Bielfeldt; docket No. 6156-96, Karen J. Bielfeldt Gray; docket No. 7264-96, Gary K. & Carlotta J. Bielfeldt; docket No. 7265-96, Gary K. Bielfeldt; docket No. 7346-96, David L. & Julie K. Bielfeldt. After trial, however, the parties notified the Court that the issue addressed herein applies only to docket No. 5936-96. Accordingly, the issue addressed herein applies only to docket No. 5936-96.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, Judge: Gary K. Bielfeldt and Carlotta J. Bielfeldt petitioned the Court to redetermine respondent's determination of deficiencies in, and additions to, their 1984 through 1988 Federal income taxes. Respondent determined the following deficiencies and additions thereto:

|  |  | Additions to Tax | |
| Year | Deficiency | Sec. 6653(a)(1) | Sec. 6661 |
| 1984 | --- | $32,514 | --- |
| 1985 | $5,013,651 | 1,280,929 | $1,253,413 |
| 1986 | 19,342,834 | 967,142 | 4,835,709 |
| 1987 | 6,871,323 | 343,566 | 1,717,831 |
| 1988 | 2,523,008 | 126,150 | 630,752 |

Respondent also determined that petitioners are liable for the time-sensitive addition to tax under section 6653(a)(2) for each of the taxable years from 1984 through 1987.

Following the trial of one of the issues arising in this case, we must decide whether gains and losses realized by Gary K. Bielfeldt (petitioner) on the disposition of U.S. Treasury securities (Treasury securities) are ordinary or capital. We hold they are capital. Unless otherwise stated, section references are to the Internal Revenue Code in effect for the relevant years.

FINDINGS OF FACT

I. Overview

Some facts have been stipulated and are so found. The stipulated facts and exhibits submitted therewith are incorporated herein by this reference. Petitioner and Ms.

Bielfeldt are husband and wife, and they resided in Peoria Heights, Illinois, when they petitioned the Court. They are cash method taxpayers, and they filed joint Federal income tax returns for the subject years. Their 1984 through 1988 tax returns were prepared by Peat, Marwick, Mitchell & Co., or a successor thereto (collectively, Peat, Marwick). Their 1989 return was prepared by Coopers & Lybrand. Petitioner holds a bachelor's degree and a master's degree.

During the subject years, petitioner bought and sold Treasury securities, and his tax returns for those years reported his sales as capital gains or capital losses. Petitioner's 1984 return reported that he was an "investor" in Treasury securities. Petitioner's 1985 through 1989 returns reported that he was a "trader" in Treasury securities. Petitioner notified respondent of his claimed change in status by attaching a statement to his 1985 tax return that read in relevant part as follows:

> During 1985 the above-named taxpayer had a very extreme change in the volume of trading activities conducted on his own behalf. The magnitude of trading activities now qualify the taxpayer as "trader" for tax purposes rather than an "investor".

Respondent audited petitioner's 1984 through 1989 taxable years, and, at or about the same time, respondent audited the related years of Bielfeldt & Co. (B&C) and its predecessor Bielfeldt, Lauritsen & Hagemeyer (BL&H), general partnerships in

which petitioner was the controlling partner.[2]  Respondent's audit of petitioner ended on April 22, 1991, with the issuance to him of a 30-day letter.

On July 17, 1991, petitioner amended his 1985 through 1988 tax returns to assert therein that he was a dealer in Treasury securities, and that he was entitled to income tax refunds resulting from reclassifying his gains and losses as ordinary. On January 11, 1996, respondent issued to petitioner a notice of deficiency that, in relevant part, disallowed the refund claims on the amended returns on the basis of respondent's determination that petitioner was not a dealer in Treasury securities.  In this proceeding, petitioner claims the following income tax refunds on the basis of his assertion that he was a dealer:

| Year | Refund |
|------|--------|
| 1984 | $3,202,380 |
| 1985 | 19,781,480 |
| 1986 | 39,160,798 |
| 1987 | 16,232,812 |
| 1988 | 6,658,075 |

## II.  Treasury Securities Cash Market

The Treasury securities cash market consists of bills, notes, and bonds issued by the Department of the Treasury (Treasury).  Treasury bills (T-bills) are issued in 3-month, 6-month, or 1-year maturities.  T-bills are non-interest-bearing

---

[2] BL&H's partnership agreement was amended on Dec. 7, 1985, to change BL&H's name to B&C as of Jan. 1, 1986.  Both BL&H and B&C filed Forms 1065, U.S. Partnership Return of Income. Hereinafter, we refer to BL&H as B&C.

obligations that are issued below face value and redeemed at maturity at face value. Treasury notes (T-notes) are issued in 2-, 3-, 4-, 5-, 7-, or 10-year maturities. T-notes are issued at or near face value, and they are redeemed at maturity at face value. T-notes bear a fixed rate of interest, which is payable semiannually, and most T-notes are noncertificated; i.e., they do not exist in physical form but trade through an electronic system known as the Federal Reserve Bank book entry system. Treasury bonds (T-bonds) mature 10 or more years after issuance. T-bonds are issued at or near face value, and they are redeemed at maturity at face value. T-bonds bear interest, which is payable semiannually, and most new T-bonds are noncertificated. The interest rate on new T-bonds is set at auctions held by the Federal Reserve Bank of New York (the Fed).

Treasury securities are rarely listed on an organized exchange, and the volume of trading of Treasury securities on organized exchanges is minimal. Virtually all trading of Treasury securities occurs over the counter or at auctions which the Treasury holds to sell the securities initially. Auction bidders tender competitive or noncompetitive bids. Competitive bids generally represent the price that bidders offer to buy the securities, and noncompetitive bids generally represent the bidders' offers to buy the securities at the average of the successful competitive bids. Bidders, other than primary dealers (as defined below), must deposit 10 percent of any competitive

bid tendered, and these deposits are held without interest for days or weeks until the auction purchase settles. In practice, only primary dealers submit competitive bids directly to the Treasury; they do so for their own accounts as well as on behalf of others.

After Treasury securities are issued through the auction process, they are generally traded over the counter in direct transactions between the buyer and the seller or through interdealer brokers (as defined below).[3] Prices are quoted as bids (the price that a buyer is willing to pay) and offers or asks (the price at which a seller is willing to sell). A transaction is effectuated when a buyer or seller accepts a bid or offer, respectively, or when they negotiate a different price. Over-the-counter trading of Treasury securities is usually effectuated over the telephone on the basis of established business relationships.

"Primary dealers" are the 35 to 40 firms which have been recognized as such by the Fed to deal with it directly in the Treasury securities market.[4] In designating primary dealers, the

---

[3] Between the announcement of an upcoming auction and the issuance of the securities following the auction, new issues of Treasury securities also are traded over the counter on a "when-issued" (WI) basis for a period that may last from several days to approximately 2 weeks. The purchaser of WI securities must pay for the securities on or before the date that the securities are issued.

[4] Dealers in the Treasury securities market who are not primary dealers are known informally as "secondary dealers".

(continued...)

Fed applies the following criteria: (1) The firm must have adequate capital relative to the positions it assumes; (2) the firm must participate consistently and meaningfully in Treasury auctions of new securities and must submit bids in every auction; (3) the firm must file periodic reports with the Fed setting forth certain market information; and (4) the firm must be an effective market maker.

Primary dealers trade Treasury securities for their own accounts (proprietary trading) or for the accounts of customers pursuant to customer directives (customer trading). These two types of trading are not mutually exclusive. A primary dealer may accept a customer's bid or offer for a particular security as part of the dealer's proprietary trading strategy, or it may initiate trades to improve its proprietary position. Primary dealers frequently trade Treasury securities with other primary dealers either directly (trader to trader) or indirectly through interdealer brokers. Primary dealers frequently sell to other primary dealers the Treasury securities that they purchase at auction. When a primary dealer and a counterparty agree on a transaction, a trade ticket is prepared which states the terms of the transaction. The primary dealer uses the information on the trade ticket to prepare a confirmation slip that is sent to the counterparty.

---

[4](...continued)
The Treasury securities market has many secondary dealers.

Interdealer brokers are brokerage firms that facilitate trades between counterparties who are mainly primary dealers; interdealer brokers do not hold positions in Government securities themselves. The principal interdealer brokers are RMJ, Fundamental Brokers, Inc., Garban, Liberty, and Cantor Fitzgerald (CF). CF is the only interdealer broker that trades for customers other than primary dealers. CF's customers include banks, fund managers, and investment funds. Approximately 30 percent of CF's volume of trading in Treasury securities is for customers who are not primary dealers.

Interdealer brokers provide their customers with CRT terminals (screens) on which the customers may view in their offices the best bids and offers made by the broker's subscribers. The customers telephone bids and offers to their broker, and the broker electronically posts these bids and offers on its screens without identifying the customers who are tendering the bids or offers.[5] When a person accepts a bid or an offer listed with the broker, the broker effectuates the transaction and indicates on its screens that the bid or offer was accepted. The broker sends confirmation to the buyer and seller showing the broker itself as the counterparty; neither the person quoting the price nor the person accepting the price knows

---

[5] Bids and offers are also quoted directly (verbally or otherwise) between potential counterparties.

the identity of the counterparty.[6]  The broker earns a
commission, which is paid by the person who accepted the bid or
offer.

III.  Financing Positions in Treasury Securities

Treasury securities are excellent collateral for loans
because they are highly liquid.  Loans secured by Treasury
securities usually take the form of a simultaneous "sale" of the
security by the borrower to the lender and a binding obligation
of the borrower to "repurchase" the security from the lender in
the future at a somewhat higher price than the original sale
price.[7]  The difference between the purchase and sale prices is
the functional equivalent of interest.  A borrower calls these
transactions "repurchase agreements" or "repos", and a lender
calls these transactions "reverse repurchase agreements" or
"reverse repos".  A reverse repo allows a person with idle cash
to earn interest on the idle funds, and it allows a seller of
unencumbered Treasury securities to finance a counterparty's
purchase of securities.  A reverse repo also lets a short seller
of Treasury securities borrow the securities to cover a short
sale; cash is transferred to the security lender as collateral to
guarantee return of the borrowed security, and the short seller

---

[6] For this reason, interdealer brokers are known as "blind
brokers".

[7] Although the "loans" are actually independent purchase and
sale transactions, the terms "borrower" and "lender" are used
figuratively to simplify the explanation of these financing
arrangements.

earns interest on the cash collateral.  The lender under a repo typically buys and resells the Treasury security at a small discount from its current value.

Repos can mature overnight, they can have fixed, longer terms, or they can have indefinite terms that continue until terminated by either party.  The interest rate charged by a repo lender can be fixed for the term of the repo, or it can be reset daily.

Repurchase and reverse repurchase transactions are primarily transacted over the telephone, and primary dealers, secondary dealers, interdealer brokers, and other market participants engage in repos and reverse repos as principals.  The Treasury securities cash market is characterized by highly leveraged transactions, and virtually all participants in the Treasury securities market engage in leveraged trading to a large extent.

IV.  Background of Petitioner and B&C

Petitioner has worked in the commodities and securities industries his entire career.  From 1960 to 1970, he worked as a securities broker registered with the National Association of Securities Dealers (NASD), the New York Stock Exchange, and the American Stock Exchange.  From 1970 to 1972, he worked with J.W. Dickson, a Futures Commission Merchant (FCM) and a member of the Chicago Board of Trade (CBT).[8]  In 1972, he began working for

---

[8] An FCM is a designation given by the Commodity Futures Trading Commission (CFTC) to a person who it has licensed to do
(continued...)

B&C, a commodities clearing firm that he formed in partnership with three former coworkers. Petitioner was B&C's managing partner, and he initially owned 54 percent of its equity. B&C traded commodity futures for its own account and for the accounts of its customers, and it cleared trades for customers with accounts which it managed on a nondiscretionary basis (nondiscretionary accounts).[9] B&C was a member of the CBT and the Board of Trade Clearing Corporation. B&C was registered with the CFTC as an FCM.

At the end of 1982, petitioner purchased his partners' interests in B&C, and he installed his three children as partners as of January 1, 1983. As relevant herein, petitioner owned 95.5 percent of B&C, and each of his children owned 1.5 percent. B&C traded Treasury securities in both the cash and futures markets for customer accounts and for its own accounts, and it had established trading relationships and credit lines with a number of primary and secondary dealers. B&C facilitated retail customers' submittal of noncompetitive bids in Treasury auctions by forwarding their bids to a primary dealer named Harris Bank & Trust. B&C acted on behalf of the retail customers in reselling the securities purchased at auction at the highest available

---

[8](...continued)
business in the futures market.

[9] Alternatively, an account could be managed on a discretionary basis. In the case of discretionary accounts, customers give their broker a set amount of money to manage in the manner which the broker believes is wise.

price.   B&C's retail customers in Treasury securities were long-term clients, personal friends, employees, and friends of personal friends.   The only account holders at B&C, other than petitioner, who traded Government securities were customers of B&C, not of petitioner.

B&C's offices are in Peoria and Chicago, Illinois, and employees in both offices engage in proprietary trading.   The Peoria office is primarily responsible for customer relations, including identifying and soliciting customer prospects, preparing customer account agreements, responding to customer inquiries, and administering the managed account program.   The Chicago office serves "back office" functions, clearing all Treasury securities, futures, and other trades and handling accounting, customer credit, and regulatory compliance. Petitioner works out of the Peoria office, and B&C pays the rent on the space that he uses.   Petitioner used this space to engage in his personal trading, which included the trading of futures contracts, stocks, corporate bonds, and all three types of Treasury securities.   Petitioner transacted his personal trades through B&C, and B&C cleared these trades and performed the required bookkeeping for them.   Petitioner used B&C's video screens and other market information services to assist him with his Treasury securities cash trading, and he used B&C's telephones and direct lines to primary dealers.   An employee in

the Peoria office arranged financing for petitioner's Treasury securities trades.

Petitioner's personal trading was transacted through B&C's House Account 2900 (Account 2900). B&C maintained this account as a "partner's account", and the securities purchased and sold in Account 2900 were petitioner's property. Petitioner did not share with his partners the gains and losses from trading these securities, and he made his own trading decisions in trading in this account. The typical holding period for the Treasury securities held in Account 2900 was less than 1 month.

Petitioner's trading records were maintained primarily in the Peoria office by B&C employees; B&C's records were maintained in the Chicago office. B&C employees in Peoria forwarded clearing instructions to the Chicago office for all of petitioner's Account 2900 trades, and B&C employees in the Chicago office cleared all these trades and made appropriate entries in B&C's records.

The Government Securities Act of 1986 (the 1986 Act), Pub. L. 99-571, sec. 102(e) and (f), 100 Stat. 3218, 15 U.S.C. sec. 78o, became effective in July 1987. Before that time, most dealers in Treasury securities were not required to register with the Securities and Exchange Commission (SEC) or the NASD. The 1986 Act required Government securities brokers and dealers to register with the SEC and the NASD unless an exemption applied. Initially, there was uncertainty as to whether the 1986 Act

required firms like B&C, already registered with and regulated by the CFTC as an FCM, to register with the SEC and the NASD. B&C initially applied for registration but later withdrew its application on the basis of its understanding that it was not required to register because it was an FCM. Petitioner, who was not personally registered as an FCM, never registered with the SEC as a Government securities dealer for a trade or business separate from B&C's, and he never registered with the NASD as a dealer for a trade or business separate from B&C's.

Generally, any person acting as a dealer in securities and maintaining a place of business in Illinois must register with the Illinois secretary of state. B&C did not register with the Illinois secretary of state because of its understanding that it was exempt from registration requirements as an FCM. Petitioner never registered with the Illinois secretary of state as a dealer for a trade or business separate from B&C's.

V. Petitioner/B&C Trading in Treasury Securities Cash Market

Petitioner traded Treasury securities through Account 2900 with the following known counterparties:

```
    Aubrey G. Lanston & Co., Chicago
    Barclays de Zoete Wedd, New York
    Chemical Bank, New York
    Chicago Research & Trading Co., New York
    Citibank, N.A./Citicorp, New York
    Continental Illinois National Bank and Trust Co., Chicago
    Daiwa Securities America, Inc., New York
    Discount Corp. of New York
    Drexel Burnham Lambert Government Securities, Inc., New York
  * Fidelity Investments Brokerage Services, Boston
    First Boston Corporation, New York
    First Interstate Bank of California, Chicago
```

```
    Goldman, Sachs & Co., New York
    Greenwich Capital Markets, Inc., Greenwich, CT
    Harris Trust & Savings Bank, Chicago
    Kidder Peabody & Co., Incorporated, Chicago
    Kleinwort Benson Government Securities, Chicago
    Lehman Government Securities, Inc., New York
    Lloyds Government Securities, Inc., New York
    Manufacturers Hanover Trust Co., New York
    Merrill Lynch Government Securities, New York
    Morgan Stanley & Co., Inc., New York
    Nomura Securities International Inc., New York
    Salomon Brothers Inc., New York
    Smith Barney Government Securities, Inc., Chicago
  * Staley Financial Services Inc., New York
    Yamaichi International American Inc., New York
```

All of these counterparties, other than the two denoted with an asterisk, were or became primary dealers during the subject years. Petitioner regularly purchased securities from and sold securities to, and engaged in repos and reverse repo transactions with, these counterparties. These transactions were effectuated through Account 2900. Petitioner traded Treasury securities in Account 2900 directly with these counterparties on a principal-to-principal basis. He also traded Treasury securities in Account 2900 with other, unknown counterparties (i.e., on a blind basis) through CF. He regularly dealt with many different counterparties to improve his access to market information. He traded mainly with large primary dealers because they were among the most active participants in the Treasury securities cash market, and they traded the largest volumes.

Before 1985, B&C opened an account with CF. CF provided B&C with its Speed System electronic screen; B&C already had two screens. Through CF, petitioner posted bids and asks on these

screens and executed blind trades with counterparties who were either primary dealers or other market participants. Petitioner could not place orders to buy or sell securities on any other interdealer broker screen because those screens were restricted for use by primary dealers only. CF gave petitioner the same favorable commission rate extended to primary dealers on account of the volume of his trading. The advantageous commission rate offered to petitioner, based on volume, was generally available to all CF customers.

Petitioner worked an average of 12 hours per day, spending 60-80 percent of his time trading in Account 2900. His trading assistant, a B&C employee named Cindy James, verbally confirmed all of his Account 2900 trades with his counterparties on the day of the trade, and, during the next day, she verified principal and accrued interest and prepared the necessary cash and security delivery instructions. Although it was customary for dealers to send their customers confirmation, petitioner did not send confirmation to his counterparties.

Petitioner traded the following dollar volumes in the Treasury securities cash market during 1985 through 1989:

| COUNTERPARTY | 1985 | 1986 | 1987 | 1988 | 1989 |
|---|---|---|---|---|---|
| Aubrey Lanston | -0- | -0- | -0- | -0- | $50,000,000 |
| Barclays Bank | -0- | -0- | -0- | -0- | 150,000,000 |
| CF[1] | $6,668,145,000 | $15,757,000,000 | $1,427,000,000 | $1,828,000,000 | 9,547,000,000 |
| Chemical Bank | -0- | -0- | 50,000,000 | 55,000,000 | 200,000,000 |
| Chicago Research & Trading | -0- | 1,808,000,000 | -0- | -0- | 535,000,000 |
| Citibank | -0- | -0- | 294,000,000 | -0- | 4,348,000,000 |
| Continental Bank | -0- | -0- | -0- | -0- | 636,000,000 |
| Daiwa | -0- | 150,000,000 | -0- | -0- | 139,000,000 |
| Discount Corp. | 50,000,000 | 1,415,000,000 | 200,000,000 | 70,000,000 | 485,000,000 |
| Drexel Burnham | 1,872,600,000 | 4,348,000,000 | 934,500,000 | -0- | 550,000,000 |
| Fidelity | -0- | -0- | -0- | -0- | 200,000,000 |
| First Boston | 3,686,550,000 | 3,298,000,000 | 105,000,000 | -0- | 150,000,000 |
| First Interstate | 2,330,000,000 | 2,712,800,000 | 400,000,000 | -0- | -0- |

| | | | | | |
|---|---|---|---|---|---|
| Goldman Sachs | 12,761,645,000 | 12,134,750,000 | 7,777,000,000 | 12,291,000,000 | 2,368,000,000 |
| Greenwich Capital | -0- | -0- | -0- | -0- | 2,010,000,000 |
| Harris Bank | 1,357,000,000 | 108,000,000 | 10,000,000 | 907,000,000 | 2,482,000,000 |
| Kidder Peabody | -0- | 410,000,000 | 575,000,000 | -0- | 50,000,000 |
| Kleinwort Benson | 494,000,000 | -0- | -0- | -0- | 100,000,000 |
| Lehman Brothers | 912,000,000 | 2,167,800,000 | 480,000,000 | 55,000,000 | 3,126,000,000 |
| Lloyds | -0- | 468,000,000 | -0- | -0- | -0- |
| Manufacturers | -0- | 630,000,000 | -0- | -0- | -0- |
| Merrill Lynch | 4,853,250,000 | 3,073,000,000 | 305,800,000 | 125,000,000 | 1,057,000,000 |
| Morgan Stanley | -0- | 150,000,000 | -0- | -0- | -0- |
| Nomura | -0- | 615,000,000 | 100,000,000 | -0- | -0- |
| Salomon Bros. | 10,073,000,000 | 69,169,750,000 | 8,869,500,000 | 3,107,000,000 | 9,829,000,000 |
| Smith Barney | -0- | -0- | -0- | -0- | 250,000,000 |
| Staley | 50,000,000 | -0- | -0- | -0- | -0- |
| Yamaichi | -0- | 215,000,000 | -0- | -0- | -0- |
| Total | 145,108,190,000 | 118,630,100,000 | 21,527,800,000 | 18,438,000,000 | 38,262,000,000 |

[1]These volumes refer to trades brokered by CF on a blind basis.

Dealers try to be available regularly to satisfy customer requests, and the normal function of a Government securities trading desk at a primary dealer is to try to buy and sell securities all the time. Primary dealers typically engage in Government securities trading daily, and they seldom fail to respond to a customer request to do a transaction or to make a market.[10] No person ever asked petitioner to make a market, and petitioner did not always accept requests to buy or sell a security. Petitioner was more interested in buying an initial position rather than selling. He had no Government securities transactions during extended periods during the subject years; his trading gaps exceeded 100 days in 1987, 150 days in 1988, and 200 days in 1989. He did not trade on a regular daily basis during 1987, 1988, and 1989, and he suffered increasing losses in those years.

The Treasury holds 157 Treasury securities auctions each year, most of which are weekly auctions of Treasury bills.

---

[10] Making a market means providing a simultaneous bid and offer on the same security pursuant to a customer request.

Petitioner was awarded Treasury securities in 23 auctions in 1985, 19 in 1986, 14 in 1987, 9 in 1988, and 9 in 1989. Petitioner's auction purchases as a percentage of his total purchases of Treasury securities ranged from 25 to 50 percent during 1985 through 1989.  Overall, petitioner acquired more than one-third of his Treasury securities through auctions during that period.  Petitioner participated actively in the auctions because they allowed him to acquire a large position in a short time at one price.  Petitioner then traded from the core positions acquired at auction, adding to his holdings through purchases and selling the securities to primary dealers in smaller blocks. Petitioner frequently submitted multiple bids in the same auction through different primary dealers.  Petitioner never acquired a Treasury security on the auction in response to a prospective buyer's request to repurchase that security from him.

Petitioner had ongoing contacts with CF and numerous primary dealers.  There was no difference in the way CF treated petitioner and the way it treated any other CF customer.  When a customer of CF would call to place a bid or offer on the CF system, it was solely the customer's choice to decide the security on which he would make a bid or offer.  When petitioner called CF to post a bid or offer on the CF system, it was solely his choice whether to do so, and solely his choice as to the specific security he wanted to bid or offer.  When petitioner called CF to post a bid or offer on the CF system, it was not

pursuant to a request by a customer of petitioner to do a trade. Many times petitioner would submit a bid to CF and ask that it be continuously re-input into the CF system until petitioner was successful in buying the desired security. Petitioner on occasion gave discretion to primary dealers as to price for both auction and nonauction transactions. On other occasions, petitioner would give the primary dealers "orders".[11] Petitioner never received a customer order in Government securities.

Petitioner typically financed his purchases of Treasury securities through repurchase agreements. Ms. James contacted primary dealers and CF to locate the best rates. Petitioner had credit lines with 20 different primary and secondary dealers, and he could finance his purchases through any of these firms. Petitioner sometimes financed Treasury securities through a dealer other than the dealer from whom he purchased the securities. Petitioner typically dealt with a variety of counterparties in the course of acquiring, financing, and selling particular positions.

Government securities dealers usually orally confirm a trade and mail written confirmation on it. When petitioner executed trades of Treasury securities with primary dealers, the primary dealers always mailed the confirmation to B&C, sometimes to the

---

[11] An "order" is a customer's request to a dealer to purchase or sell a specified quantity of securities on the customer's behalf either at a specified price or at the best available price in the market.

attention of petitioner, sometimes with a reference to Account 2900, and sometimes with no reference to either petitioner or Account 2900. Petitioner almost always received repo trade confirmation from the primary or secondary dealers with whom he dealt. Petitioner never sent trade or repo confirmation to the primary dealers with whom he dealt and he never sent trade or repo confirmation to any of the counterparties with whom he dealt. When B&C executed a trade for a retail customer, B&C usually phoned the customer acknowledging that the trade had been executed and sent the customer a written confirmation.

Petitioner received monthly statements from the primary dealers with whom he dealt regularly, and he received monthly statements from other primary dealers irregularly. He never sent monthly statements to any of his primary dealer counterparties, and he never sent monthly statements to any of his secondary dealer counterparties. B&C routinely sent monthly statements to its customers.

The Government securities dealers with whom petitioner dealt kept various records on their customers' accounts, including petitioner's. These records included customer account agreements. B&C regularly used a customer agreement for its retail customers during the subject years. Petitioner did not receive a customer account agreement from any of the counterparties with whom he dealt.

OPINION

We must decide whether petitioner's gains and losses from his dealings in Treasury securities were ordinary or capital. Whereas an individual may generally deduct from current income all ordinary losses, sec. 165(a), an individual's deduction for capital losses is limited, secs. 165(f), 1211. See Moravec v. Commissioner, 500 F.2d 1298 (7th Cir. 1974), affg. per curiam T.C. Memo. 1973-83. An individual may currently deduct capital losses only up to the amount of his or her capital gains plus $3,000 (or $1,500 for married individuals filing separately). He or she must carry forward any excess loss to a future taxable year. Secs. 1211(b) and 1212(b); see Moravec v. Commissioner, supra.

A capital loss is any loss realized on the sale or exchange of a capital asset. See sec. 1222; Arkansas Best Corp. v. Commissioner, 485 U.S. 212, 223 (1988). A "capital asset" includes any "property held by the taxpayer (whether or not connected with his trade or business)" that is not within one of five categories. Sec. 1221; Arkansas Best Corp. v. Commissioner, supra at 215. Section 1221(1), the only category that could apply here, provides that property is not a capital asset if it is:

> stock in trade of the taxpayer or other property of a
> kind which would properly be included in the inventory
> of the taxpayer if on hand at the close of the taxable
> year, or property held by the taxpayer primarily for

sale to customers in the ordinary course of his trade
or business * * *

Petitioner focuses on this text and argues that his Treasury securities were not capital assets. According to petitioner, even if he did not hold the Treasury securities for sale to customers, the securities were "stock in trade" or "other property of a kind which would properly be included in * * * [his] inventory * * * if on hand at the close of the taxable year". Petitioner asserts that he bought the Treasury securities for resale, which, he concludes, means that the securities were stock in trade or inventory. Petitioner asserts that an ordinary loss arises from the sale of property in an everyday activity, such as his security trading, in which there are short holding periods, a frequency and volume of sales, and regular interaction with buyers. Alternatively, petitioner argues, he held the Treasury securities "primarily for sale to customers in the ordinary course of his trade or business". Petitioner asserts that his customers were his primary dealer counterparts; according to petitioner, the meaning of the word "customer" includes any person with whom he had established business relationships and with whom he dealt regularly on a principal-to-principal basis. Petitioner asserts that the fact that he held his Treasury securities primarily for sale to customers is evidenced by the fact that B&C bought and held securities primarily for sale to its customers. Petitioner

asserts that the mere fact that he traded on his own account, rather than on behalf of third parties, does not take him outside the definition of a dealer.

Respondent replies that petitioner's gains and losses were capital because he was not a dealer. Respondent asserts that petitioner traded for his own account and that he had no customers. Respondent asserts that petitioner had no separate place of business to conduct his trading and that he used B&C's resources to effectuate his trades. Respondent asserts that petitioner did not register as a dealer with the SEC, NASD, or Illinois secretary of state. Respondent asserts that petitioner did not treat himself as a dealer on his tax returns as originally filed.

We agree with respondent that petitioner was not a dealer in Treasury securities during the subject years. To start with, petitioner is incorrect in asserting that his Treasury securities were his stock in trade or inventory, even if he did not hold the securities for sale to customers. As courts have consistently held, securities may be classified as stock in trade or inventory only when they are held primarily for sale to customers in the ordinary course of business. Marrin v. Commissioner, 147 F.3d 147, 152 (2d Cir. 1998), affg. T.C. Memo. 1997-24; United States v. Wood, 943 F.2d 1048, 1051 (9th Cir. 1991); Swartz v. Commissioner, 876 F.2d 657, 659 (8th Cir. 1989), affg. per curiam T.C. Memo. 1987-582; United States v. Diamond, 788 F.2d 1025,

1029 (4th Cir. 1986); <u>Van Suetendael v. Commissioner</u>, 152 F.2d 654, 654 (2d Cir. 1945), affg. per curiam a Memorandum Opinion of this Court dated Sept. 25, 1944; <u>King v. Commissioner</u>, 89 T.C. 445, 458 (1987); see <u>Wood v. Commissioner</u>, 16 T.C. 213, 225-226 (1951) ("It is well settled that property cannot be classified as stock in trade or property subject to inventory unless it is held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business."); see also <u>Kelly v. Commissioner</u>, T.C. Memo. 1996-529; <u>Tybus v. Commissioner</u>, T.C. Memo. 1989-309. The mere fact that petitioner may have sold the Treasury securities in the ordinary course of his trade or business, an assertion that petitioner vigorously makes but which we decline to decide, does not mean, as petitioner asks us to hold, that the securities are outside the meaning of the term "capital asset" as used in section 1221. In order to escape the broad reach of that term, and the resulting classification as a capital gain or capital loss, petitioner's sales not only must have been "in the ordinary course of his trade or business", but must have been "to customers" as well.[12] In fact, the phrase "to customers" was expressly added to the predecessor of section

---

[12] Petitioner, citing <u>Corn Prods. Ref. Co. v. Commissioner</u>, 350 U.S. 46 (1955), argues on brief that the term "capital asset" is narrowly defined for purposes of sec. 1221. We disagree. In <u>Arkansas Best Corp. v. Commissioner</u>, 485 U.S. 212, 222 (1988), the Supreme Court clarified that the term "capital asset" is construed broadly, and that "<u>Corn Products</u> * * * [stands] for the narrow proposition that hedging transactions that are an integral part of a business' inventory-purchase system fall within the inventory exclusion of § 1221."

1221(1) in the Revenue Act of 1934, ch. 277, 48 Stat. 680, to make it "impossible to contend that a stock speculator trading on his own account is not subject to the [capital loss limitation] provisions".  H. Conf. Rept. 1385, 73d Cong., 2d Sess. 22 (1934), 1939-1 C.B. (Part 2) 627, 632; see also United States v. Diamond, supra at 1028; Mirro-Dynamics Corp. v. United States, 374 F.2d 14, 16 (9th Cir. 1967); Kemon v. Commissioner, 16 T.C. 1026, 1032 (1951).  For a detailed discussion of the legislative history of the "to customers" amendment, see King v. Commissioner, supra at 457-458; Kemon v. Commissioner, supra at 1032; Wood v. Commissioner, supra at 219-220.

As to petitioner's alternative argument, namely, that he sold the Treasury securities to customers, whether an individual sells securities to customers is a question of fact that hinges on his or her classification as a dealer, trader, or investor. Kemon v. Commissioner, supra at 1032.  All purchasers of securities are within one of these three categories, and only a dealer is eligible for the section 1221(1) exception because only a dealer has customers.  United States v. Wood, supra at 1051-1052.  As the Court of Appeals for the Ninth Circuit has stated, in distinguishing these three types of purchasers:

> A dealer is a person who purchases the securities or commodities with the expectation of realizing a profit
>
> not because of a rise in value during the interval of time between purchase and resale, but merely because

they have or hope to find a market of buyers who will purchase from them at a price in excess of their cost. This excess or mark-up represents remuneration for their labors as a middleman bringing together buyer and seller, and performing the usual services of retailer or wholesaler of goods.

Kemon v. Commissioner, 16 T.C. 1026, 1032-33 (1951). Dealers have customers for purposes of section 1221. See United States v. Diamond, 788 F.2d 1025, 1029 (4th Cir. 1986).

Traders, on the other hand, are sellers of securities or commodities who "depend upon such circumstances as a rise in value or an advantageous purchase to enable them to sell at a price in excess of cost." Id. at 1033. A trader performs no merchandising functions nor any other service which warrants compensation by a price mark-up of the securities he or she sells. Id. at 1032-33. "[A] trader will be deemed to be engaged in a trade or business if his or her trading is frequent and substantial. King, 89 T.C. at 458. Generally, both dealers and traders will be engaged in a trade or business; only a dealer, however, has customers.

An investor is very similar to a trader. Like a trader, an investor "makes purchases for capital appreciation and income." King, 89 T.C. at 459. Unlike a trader, however, an investor makes such purchases "usually without regard to short-term developments that would influence prices on the daily market." Id. An investor, on the other hand, will never be considered to be engaged in a trade or business with respect to his or her investment activities, no matter how extensive his or her activities might be. Id. at 459. [Id.]

See also sec. 1.471-5, Income Tax Regs. (regulatory definition of a dealer in securities).

Petitioner was not a dealer. First, he did not conduct his trading activity in the manner in which a dealer would have. He personally owned all of the Treasury securities that he traded,

he traded those securities only for his own account, and he reported on his personal income tax returns the gains and losses on his trades. He did not make a market in Treasury securities, and he did not earn a commission on any of his trades because the counterparties thereto were not required to pay him a commission. He did not maintain a place of business for trading his securities separate from B&C's, and he did not effectuate trades pursuant to a directive. He did not treat his counterparties as customers; e.g., he did not send them confirmation, he did not have them sign customer account agreements, and he did not send them monthly statements.[13] Although he was a part owner of B&C, the business of which included trading securities to customers, he did not trade his Treasury securities in the course of that business. He merely used B&C's resources to assist him in his independent activity of trading Treasury securities. Although he asks the Court to consider his trading activity part of B&C's business activity, we decline to do so. Petitioner and B&C are separate, and, under the facts herein, we will not disregard their separateness or otherwise treat them as one. To the extent that petitioner asks the Court to conclude that he used B&C as

---

[13] Petitioner asks the Court to find that sending written confirmation was not the practice in the industry, especially in cases where, like his, all trades were confirmed orally. Petitioner also asks the Court to find that the industry practice was not to send monthly statements to, or obtain customer agreements from, institutional investors. We decline to make either finding. Neither finding is supported by reliable evidence in the record.

his agent and instrumentality for purposes of trading the Treasury securities in Account 2900, the facts at hand do not support such a conclusion. The fact that petitioner personally owned his Treasury securities, that he traded them for his own account, that he did not have a separate place of business to conduct his trading, and that his only source of income from his trading depended on an increase in value all militate against categorizing him as a dealer. See Marrin v. Commissioner, 147 F.3d at 151; Kemon v. Commissioner, supra at 1032.

Second, petitioner's primary intent in trading Treasury securities was inconsistent with that of a dealer. A dealer purchases securities intending to profit primarily from selling the securities at an increased price that represents remuneration for working as a middleman and performing the usual services of retailer or wholesaler of goods. Kemon v. Commissioner, 16 T.C. at 1032-1033; see Estate of Hall v. Commissioner, 29 B.T.A. 1255, 1259-1260 (1934), affd. sub nom. Commissioner v. Stevens, 78 F.2d 713 (2d Cir. 1935); see also MacAdam v. Commissioner, T.C. Memo. 1991-410. Petitioner, by contrast, aimed to reap a profit from an increase in value caused by a favorable fluctuation in interest rates, and, but for such a favorable fluctuation, he would not have reaped any meaningful profit at all. Interest rates change daily, and petitioner speculated that the short-term course of those rates would be consistent with the course that he predicted, which, in turn, would increase the value of his

securities.  The mere fact that petitioner may have traded Treasury securities regularly and extensively does not necessarily mean, as petitioner would have us hold, that any purchaser of those securities was a customer of his.  A profit motive that hinges on a hope or expectation of prospering from a rise in the value of a security is not indicative of a dealer. See United States v. Wood, 943 F.2d at 1051-1052; see also Marrin v. Commissioner, supra at 151.

Third, petitioner's pool of purchasers was not indicative of that of a dealer.  His pool was almost exclusively primary dealers, and most of his trades were effectuated through two of those dealers; namely, Salomon Brothers, Inc., and Goldman, Sachs & Co.  He sold many of his securities to the same primary dealer from whom he had bought them.  See Van Suetendael v. Commissioner, 152 F.2d at 654; MacAdam v. Commissioner, supra. Such a pool of purchasers as that maintained by petitioner is not indicative of a dealer.  Accord Marrin v. Commissioner, 147 F.3d 147 (2d Cir. 1998) (taxpayer who bought stock from a broker and sold it to the same or another broker was not entitled to ordinary loss treatment); Faroll v. Jarecki, 231 F.2d 281 (7th Cir. 1956) (taxpayer who traded futures contracts on the floor of the CBT on his own behalf, and not for the account of the partnership of which he was a member or for any customer of the partnership, did not hold the contracts primarily for sale to customers in the ordinary course of his trade or business); cf.

Estate of Hall v. Commissioner, supra (partnership was a dealer of securities even though its sales were made primarily to brokers on the New York Stock Exchange; partnership had established place of business, held itself out as a dealer, and, most importantly, did not buy the securities for investment or speculation).

Fourth, the fact that petitioner did not perform any merchandising functions or any other services which would have warranted a markup in the price of his Treasury securities is indicative of a trader.  See Kelly v. Commissioner, T.C. Memo. 1996-529; Furer v. Commissioner, T.C. Memo. 1993-165, affd. without published opinion 33 F.3d 58 (9th Cir. 1994).  Petitioner used B&C's facilities and personnel to trade the securities, and he never received any remuneration for working as a middleman because he never brought a buyer and seller together.  His securities were as easily accessible to one as to the other; thus, he profited only when his securities rose in value between the time that he bought them and the time that he sold them.  See Kemon v. Commissioner, supra at 1033.  The inability to mark up a security for reasons other than value appreciation is not indicative of a dealer.  See Frankel v. Commissioner, T.C. Memo. 1989-39.

Fifth, the fact that petitioner did not consider himself a dealer during the relevant time militates against classifying him as a dealer.  If petitioner had in fact been a dealer, he would

have been required to register as such with the SEC, the NASD, and the Illinois secretary of state. Yet, he did not register with any of these agencies.[14] Nor did he advertise himself as a dealer. One need only examine his tax returns as originally filed to understand that he did not consider himself a dealer at the time of their filings. None of these returns reported that he was a dealer in Treasury securities. They reported that his gains and losses were capital. Although he testified that he did not know when he originally filed his returns that the Federal tax laws differentiated between gains and losses that were capital as opposed to ordinary, we find this testimony illogical when considered in the light of the record as a whole. Petitioner is an intelligent man who, when he filed his 1984 tax return, had been working for more than 25 years. During each year in issue, he had experienced the benefits of capital gains and the burdens of capital losses; he reported that he was unable to deduct currently $29,457,311, $48,900,546, and $93,752,481 of capital losses that he realized (exclusive of any prior year

---

[14] Petitioner and B&C's chief financial officer testified that they believed that petitioner did not have to register individually because he and B&C were one and the same. We do not find this testimony persuasive. Even if petitioner did believe that he and B&C were one and the same when it came to partnership business, a finding that petitioner asks the Court to make but which we are unable to make because of a lack of substantiation, the subject trading of Treasury securities was not partnership business. It was an activity that petitioner conducted independently of B&C. Moreover, petitioner reported the gains and losses therefrom on his personal income tax return.

carryovers) in 1987, 1988, and 1989, respectively,[15] and he reported net long-term capital gains of $4,729,387, $42,213,314, and $53,119,895 on his 1984, 1985, and 1986 returns, respectively, for which he took into account 60-percent deductions under section 1202. We also believe that he was familiar with the classifications of dealer, trader, or investor. We discussed the difference between a dealer and a trader almost 10 years before petitioner first entered the securities industry, see Kemon v. Commissioner, 16 T.C. at 1032-1033, and this distinction was almost 35 years old at the time that he filed his 1984 return. We also take into account that all of the subject returns were prepared by large, multinational accounting firms, and that the 1985 return noted specifically that petitioner was a "trader", and not an "investor".[16] The fact that petitioner did not have himself licensed as a dealer, that he did not consider

---

[15] In other words, notwithstanding the multi-million-dollar capital losses that petitioner reportedly incurred during these years, he limited his capital loss deduction for 1987, 1988, and 1989 to $3,000 each. We also note that petitioner reported "total income" of $44,122,440, $24,267,722, and $58,882 for these respective years, and that he reported that his related tax liability was $16,243,036, $6,661,226, and $605, respectively.

[16] Petitioner testified that he retained Coopers & Lybrand to prepare his tax returns because it was more familiar than Peat, Marwick with the securities area. Petitioner implied during his testimony that Coopers & Lybrand saw that Peat, Marwick had incorrectly classified him as a "dealer", and that Coopers & Lybrand amended his 1985 through 1989 returns to correct Peat, Marwick's mistake. We are unpersuaded by this testimony. As a point of fact, petitioner's 1989 tax return classified petitioner as a trader, and this return was prepared by Coopers & Lybrand.

himself a dealer, and that he did not hold himself out as a dealer undercuts his argument that he was one.  See <u>Mirro-Dynamics Corp. v. United States</u>, 374 F.2d 14 (9th Cir. 1967); see also <u>Furer v. Commissioner</u>, <u>supra</u>; <u>Michelson v. Commissioner</u>, T.C. Memo. 1990-27, affd. 951 F.2d 288 (10th Cir. 1991); <u>Tybus v. Commissioner</u>, T.C. Memo. 1989-309; <u>Huebschman v. Commissioner</u>, T.C. Memo. 1980-537.

Petitioner argues vigorously that his customers were the primary dealers to whom he sold the securities.  We do not agree.  Petitioner's proffered definition of the word "customer", to wit, any person with whom he had established business relationships and with whom he dealt regularly on a principal-to-principal basis, misses the mark.  As we stated in <u>Frankel v. Commissioner</u>, <u>supra</u>, in refusing to adopt a similar definition that was proffered by the taxpayer there,[17] a "seller of securities who does not perform a merchandising function--who does not act as a middleman bringing buyer and seller together--is considered a trader, and as such, not even the broadest array of vendees will be his 'customers'".

Although not identical, the instant case is analogous to <u>Frankel v. Commissioner</u>, <u>supra</u>.  There, the taxpayer was an associate of an investment firm who began trading GNMA's for his

_____

[17] The taxpayer in <u>Frankel v. Commissioner</u>, T.C. Memo. 1989-39, asked the Court to adopt a definition under which a "customer" is "any person who buys an asset from another person".

own account in 1977.  With one exception, he sold the GNMA's back
to the same primary dealer from whom he had purchased them.  In
1980, he stopped trading GNMA's and began trading Treasury
securities through accounts which he maintained with primary
dealers.  We rejected his argument that he was a dealer and that
the primary dealers were his "customers".  We stated:

> The fact that petitioner did not trade on an organized
> exchange, but rather dealt directly with the primary
> traders, is of no consequence due to the fact that
> there existed no GNMA exchange.  * * *  Petitioner was
> a trader, not a dealer, and the primary dealers with
> whom petitioner traded were not his "customers,"
> rather, he was theirs.
>
> Petitioners would have us look to a myriad of
> other factors in defining a trader and a dealer.
> However, we point out that, unlike a dealer, a trader
> has no 'customers' and trades only on his own account.
> However, the trading activity in which traders engage
> may resemble the activity of a dealer in every other
> respect.  It is possible that the trading activity of a
> trader may rise to the level of a trade or business of
> selling securities, but, nevertheless, such sales still
> produce capital gains and losses.  King v.
> Commissioner, supra, at 457.  The distinguishing
> characteristic between a trader and a dealer is the
> presence of "customers."  [Id.]

Petitioner argues that Frankel v. Commissioner, supra, is
distinguishable because petitioner's trading activity was more
extensive than that of the taxpayer in Frankel.  We disagree that
this fact is a meaningful distinction.  As in Frankel, the
primary dealers with whom petitioner traded Treasury securities
through his personal account were not his "customers", and,
consistent with Frankel, the absence of "customers" properly

characterizes petitioner as a trader even though his trading activity may have resembled the activities of a dealer in some respects.  See Marrin v. Commissioner, 147 F.3d 147 (2d Cir. 1998) (taxpayer who bought stock from a broker and sold it to the same or another broker did not sell the stock to customers); Faroll v. Jarecki, 231 F.2d 281 (7th Cir. 1956) (taxpayer who traded futures contracts on the floor of the CBT on his own behalf did not sell the contracts to customers).

We sustain respondent's determination on this issue.  In so doing, we have considered all arguments made by petitioner for a contrary holding, and, to the extent not addressed above, find them to be irrelevant or without merit.

Because other issues remain to be tried,

An appropriate order will be issued.